IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JOHN DOE 1, as parent and natural )
guardian of PLAINTIFF C, his minor )
child; JOHN DOE 2, as parent and )
natural guardian of PLAINTIFF D, his )
minor child; JANE DOE 1, as parent and )
natural guardian of PLAINTIFF B and )
PLAINTIFF M, her minor children; JANE )
DOE 2, as parent and natural guardian of )
PLAINTIFF J, her minor child; and JANE )
DOE 3, as parent and natural guardian )
of PLAINTIFF S, her minor child, )
                                    )     5:03cv260
              Plaintiffs,           )     APRIL 28, 2006
vs.                                 )     9:00 A.M
                                    )     PANAMA CITY, FLORIDA
JOSEPH R. FRANCIS; MRA HOLDING LLC, )
a California limited liability company; )
MANTRA FILMS, INC., an Oklahoma )
corporation (d/b/a "Girls Gone Wild"); )
AERO FALCONS, LLC, a Delaware )
limited liability company; MARK D. )
SCHMITZ; and RYAN DAVID SIMKIN, )
                                    )
              Defendants.           )
_____)

TRANSCRIPT OF EVIDENTIARY HEARING
ON MOTION TO SHOW CAUSE
BEFORE THE HONORABLE RICHARD SMOAK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

COUNSEL FOR              ELIZABETH L. BEVINGTON
PLAINTIFFS' COUNSEL:     Attorney at Law
                         Holland & Knight, LLP
                         P. O. Drawer 810
                         Tallahassee, Florida 32302

FOR THE PLAINTIFFS:      D. ROSS McCLOY, JR.
                         Attorney at Law
                         Harrison, Sale, McCloy
                         & Thompson Chartered
                         P. O. Drawer 1579
                         Panama City, Florida 32402

PDF created with pdfFactory trial version www.pdffactory.com

**APPEARANCES:    (Continued)**

| | |
|---|---|
| **FOR THE PLAINTIFFS:** | **THOMAS G. DENT (Via telephone)**<br>**Attorney at Law**<br>**Seyfarth & Shaw, LLP**<br>**55 East Monroe St.,**<br>**Chicago, Illinois** |
| **COUNSEL FOR DEFENSE**<br>**COUNSEL JULIN:** | **BARRY DAVIDSON**<br>**Attorney at Law**<br>**Hunton & Williams, LLP,**<br>**Mellon Financial Center, Suite 2500**<br>**1111 Brickell Avenue**<br>**Miami, Florida 33131-1803** |
| **FOR THE DEFENDANTS**<br>**FRANCIS, MRA HOLDING,**<br>**MANTRA, AERO FALCONS:** | **THOMAS R. JULIN**<br>**Attorney at Law**<br>**Hunton & Williams, LLP**<br>**Mellon Financial Center, Suite 2500**<br>**1111 Brickell Avenue**<br>**Miami, Florida 33131-1803** |

```
1                          PROCEEDINGS
2        (Call to Order of the Court)
3              THE COURT:   Good morning.
4              MR. DAVIDSON:   Good morning.
5              MS. BEVINGTON:   Good morning, Your Honor.
6              THE COURT:   We're here for an evidentiary hearing on
7    the defendant's motion for order to show cause why the
8    plaintiff should not be held in contempt, and to disqualify the
9    plaintiffs' counsel.   This is an evidentiary hearing, so there
10   has to be evidence presented to support the allegations that
11   have been made by both sides.   I'll give the parties an
12   opportunity to make a brief opening statement and then,
13   Mr. Julin, time for you to come forward with your evidence.
14             MR. JULIN:   Your Honor, thank you very much.   Tom
15   Julin of Hunton & Williams, for the -- what's been identified
16   as the Mantra Defendants in the case.
17             THE COURT:   Just a minute.   Do we have Mr. Dent on the
18   phone?
19       (Pause)
20             MR. DENT:   Hello.
21             DEPUTY CLERK:   Okay, you're now on speaker.
22             MR. DENT:   Can you hear me?
23             DEPUTY CLERK:   Yes.
24             THE COURT:   Mr. Dent?
25             MR. DENT:   Yes.
```

1     THE COURT:  Judge Smoak.  Can you hear us all right?

2     MR. DENT:  Good morning, yes, I can.

3     THE COURT:  If you're ready, we'll proceed.

4     All right, Mr. Julin.

5     MR. JULIN:  Your Honor, Tom Julin for four of the

6  defendants, Joseph R. Francis, MRA Holding, LLC, Mantra Films,

7  Inc., and Aero Falcons and Aero Falcons LLC.

8          We're here on our motion for an order to show cause

9  and to disqualify the plaintiffs' counsel.  And we have set

10  forth in some detail the facts upon which those -- those

11  motions are based.

12          And I'll just briefly recite, I think, what are the

13  essence of those that brings us to you today.  This is a matter

14  that's always unfortunate to have to bring something like this

15  to Your Honor's attention, but it is a matter that is of

16  paramount importance to our clients.

17          There are really two aspects to the motion, and the

18  first part of it is the contention that the stay that was

19  imposed by Judge Casey Rodgers was violated by the issuance of

20  two subpoenas to the state attorney's office and to the

21  sheriff's office.  And the basis of that was really the -- the

22  sequence of events begins with, I guess, the stay hearing.  And

23  we've filed a full transcript of the February 4th, 2004

24  hearing.

25          At the time when the subpoenas came in, we were

1    surprised to see them because there had been a very clear and

2    specific discussion of subpoenas in the February 4, 2004

3    hearing.  The stay was imposed at that hearing and in a written

4    order immediately following the hearing.  And the discussion of

5    the subpoenas, I don't think, could have been any clearer, that

6    Mr. Dent had indicated that at the time that he was concerned

7    about the video materials that had been seized from the

8    defendants in connection with the criminal matter and the

9    forfeiture matter that was proceeding, and he wanted to serve a

10   subpoena immediately that would preserve those materials.  He

11   was very clear and specific in that regard.

12          Judge Rodgers was looking at both arguments, that

13   under common law principles that the case should be stayed, and

14   also under a federal statute that required the staying of the

15   -- of the case.  In fact Mr. Dent -- if you looked at the

16   transcript, you see Mr. Dent was the one that called that to

17   our attention, that a federal statute required the stay of the

18   civil action.  And Judge Rodgers, accordingly, entered the

19   stay, and also gave permission, specific permission, to serve

20   the subpoena immediately, and she could not have been clearer

21   in that regard, to make sure that those video materials were

22   preserved during the pendency of the criminal case so that at

23   the conclusion of the criminal case they could be used in the

24   civil case.

25          What happened thereafter was, in the criminal case --

PDF created with pdfFactory trial version www.pdffactory.com

1    and I don't believe there is any dispute as to this -- that

2    there was a plea agreement that had been negotiated.   And the

3    plea was about to be announced and the plea was about to be

4    entered into during the week of January 22nd.

5            I personally was not aware of this, and so when I

6    received the subpoenas on January 25th -- they were faxed to

7    me -- they were something of a surprise.   And they were a

8    surprise not only because of the timing -- and I didn't

9    understand that there was some connection to the plea agreement

10   being announced at the time -- but they were a surprise to me

11   because of the scope of the subpoenas.   They were far broader

12   than what Mr. Dent had described almost fully two years earlier

13   at the February 4th, 2004 hearing before Judge Rodgers when he

14   had indicated he was interested in the videotape material.

15           What we had was a subpoena extended to, in essence,

16   everything in the state attorney's possession, everything that

17   was also in the sheriff's possession.   The sheriff was never a

18   subject of the discussion at the February 4th, 2004 proceeding.

19   And so this was a somewhat startling development, that we had

20   the subpoena that were being issued, that would require us to

21   deal with them, to respond to them, and all of a sudden it

22   seemed to us that the stay was becoming unravelled.

23           Now, we did not immediately call this to Your Honor's

24   attention, and we did not immediately contact the other side to

25   say, this is -- this is objectionable.   There's no question

PDF created with pdfFactory trial version www.pdffactory.com

1    about that.   We really were thinking about how to deal with

2    this.   And in the context of that, the plea agreement became

3    completely unravelled; the state attorney changed position and

4    was no longer going forward with the plea agreement.

5           Now, Your Honor, we have not subpoenaed the state

6    attorney to come and testify about the reasons for the state

7    attorney withdrawing the plea agreement.   We would like to make

8    that very clear at the outset of this hearing.   We have set

9    forth in our papers -- largely upon information and belief --

10   the reasons that we believe the state attorney backed out of

11   that deal, but we are not going to call those people and get

12   them involved in a dispute between the parties here.

13          And we don't really believe that the reasons for that

14   are all that material.   You can look at the sequence of events

15   and you can come to certain conclusions as to what is

16   transpiring there, but we -- obviously our clients are facing

17   both criminal jeopardy and civil jeopardy, and our clients

18   don't have any interest in drawing the state attorney into a

19   dispute --

20          THE COURT:   Mr. Julin, you have said "on information

21   and belief."

22          MR. JULIN:   Yes.

23          THE COURT:   And does not, if you say information and

24   belief, that you have to have made reasonable inquiry?

25          MR. JULIN:   Yes.

1          THE COURT:   I think you better be prepared to call the

2     state attorney's people here today, rather than your just

3     drawing inferences about the timing of a plea deal falling

4     apart.

5          MR. JULIN:  Well, Your Honor --

6          THE COURT:   And I will tell you now, that will not be

7     sufficient.

8          MR. JULIN:   I understand, Your Honor.  It's something

9     that obviously we have had to wrestle with as to whether to

10    draw the state attorney into this matter.  And from the

11    client's view, the decision was made that if Your Honor does

12    not -- if you regard that as essential to this motion, then it

13    is something that we recognize -- we recognized that that was a

14    serious risk in coming into this proceeding, but we did not

15    want to draw the state attorney into a debate between these

16    parties.  And we are putting it before you on the basis of the

17    inferences that we draw from the timing of what happened here.

18          If that is not sufficient, we understand Your Honor's

19    view in that respect.  But I just want to make clear that we do

20    not intend to call the state attorney and to cross-examine the

21    state attorney about the reason for withdrawing from that plea

22    agreement.

23          THE COURT:  All right.

24          MR. JULIN:  We did not immediately file this motion.

25    We began to put together a motion that would show Your Honor

1    the full context of what had transpired.  And the full context,

2    as you've seen from the filings in the case, was that there

3    were serious weaknesses from our perspective that had developed

4    in the state's case, in the criminal proceedings.  There were

5    conflicts in the testimony.  And we wanted you to see that so

6    that you would fully appreciate that the plea -- that there was

7    a plea agreement that seemed to be a reasonable plea agreement

8    in the case.

9            And as we were putting that motion together that

10   described for Your Honor what was happening in the criminal

11   proceedings, Mr. Dent called me.  And this was somewhat, again,

12   of a surprise to me.  During that -- as you've seen from my

13   declaration in the case -- Mr. Dent called and suggested that

14   we talk about resolving the case, and specifically advised

15   me -- the first time that I had heard of this -- that there was

16   a parallel federal proceeding, and that to him and to

17   Mr. McCloy, it seemed as though it would be in our clients'

18   interest to try to resolve these matters so that the -- we

19   could kill two birds with one stone, as you've seen from my

20   declaration.

21           And that, to me -- and I would be glad to testify

22   about the particulars of that conversation, although I don't

23   believe those -- the facts that I've set forth in my

24   declaration are in dispute.  That, to me, clearly conveyed an

25   offer that if we were willing to settle at the level that

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Dent felt was appropriate, that the plaintiffs in our case,

2    the alleged victims in the criminal case, would be willing to

3    try to influence both the state authorities and the federal

4    authorities favorably.

5            And I had a subsequent conversation with him on the

6    following day where I asked him about the -- the level at which

7    he would be interested in settling, and he again mentioned the

8    federal proceeding, that it would be possible to stave off the

9    federal proceeding if we were to enter into a settlement

10   agreement, and that he was interested in a settlement in the

11   millions.

12           And it was at that point -- it was shortly after that

13   that we filed the motion, because here it seemed to us that we

14   had had the full facts played out, and it seemed, from the

15   inferences that we drew from the time line primarily, that

16   there had been an effort to keep the state criminal prosecution

17   going in an effort to use both the state criminal proceeding

18   and the federal criminal proceeding to influence the resolution

19   of the civil proceeding.

20           THE COURT:  Well, Mr. Julin --

21           MR. JULIN:  Yes.

22           THE COURT:  -- didn't you take sort of a converse

23   position earlier in the case when you were asking for the stay

24   -- and I'm looking at part of your memorandum in document 93,

25   and your title is, "A Stay May Help With the Resolution of

1    Plaintiffs' Claims."  You said, "A stay may help the plaintiffs

2    because the government's prosecution may narrow the issues and

3    reduce litigation expenditures, as it has already

4    done...resolution of the criminal case may lead to a speedy

5    settlement..."

6         MR. JULIN:  Yes.

7         THE COURT:  Didn't you sort of already take sort of a

8    mirror image of that very argument?

9         MR. JULIN:  Your Honor, I don't believe that there's

10   anything inconsistent with our saying that the criminal case

11   should go forward and should be resolved and then the civil

12   case separately and apart, not connected to the criminal case,

13   should be separately resolved.  We felt that the criminal case,

14   yes, could resolve some of the issues.  The evidence would come

15   out there; there would be whatever resolution existed there.

16        And what we're complaining about here is -- is that

17   the plaintiffs' lawyers have connected the two and have

18   interfered with, it appears to us, the resolution, the final

19   resolution of the criminal -- the state criminal proceedings,

20   and possibly whatever federal proceedings remain out there.

21   And this is something I don't have any sort of personal

22   knowledge about other than through Mr. Dent informing me that

23   there is a federal investigation and that his clients could be

24   of some assistance in making sure that that federal proceeding

25   does not come to pass.

1    When that was conveyed to me, it could not have been

2  clearer that this was an effort by an attorney who was admitted

3  to practice before this court, to use the coercive effect of

4  those criminal proceedings and their clients' ability to have

5  some impact on those proceedings to extract a settlement in the

6  civil case.

7    It was only after all of that had played out that our

8  clients felt like we needed to call this to your attention.

9  And our objective, Your Honor -- our objective is simply to try

10 to make sure that the civil lawyers are not using that criminal

11 case, are not using it to pressure resolution of the civil --

12 of the civil case.  That is the major complaint that we have to

13 bring to you today.  And we think that the civil lawyers should

14 be directed not to, in any way, continue to engage in that type

15 of conduct because it is, we believe, expressly prohibited by

16 the Florida Bar rules that you cannot use criminal proceedings

17 to coerce a resolution of a civil case.

18    THE COURT:  Is there any way to deal with that short

19 of the ultimate sanction of disqualification?

20    MR. JULIN:  Well, there may be, Your Honor.  I

21 think -- obviously the airing of this, I hope, will have an

22 impact on this; that it will at least give -- if Your Honor

23 were to enter no particular relief, no particular sanction in

24 this regard, I think it's possible that simply the public

25 airing of this and the making it clear that we are sensitive to

1   this, and that our clients are -- who are facing major criminal

2   liability at this time, do not want to have the civil attorneys

3   in this case coming into the criminal case and then attempting

4   to sustain the criminal case beyond its natural life, if you

5   will, so they can continue to use it in the context of

6   resolving the civil case.

7            Now the disqualification, it really arises from

8   something separate and apart from the scenario that I have just

9   described here.  The disqualification arises primarily from the

10  representation that the Harrison Sale firm has of the sheriff's

11  office in this case.  And that was a matter that we called to

12  their attention back in 2003, shortly after the case had been

13  filed.  It struck us as certainly very odd at the time that the

14  civil case was first filed in October of 2003, that the

15  plaintiffs, our clients' adversaries, were being represented by

16  the very same law firm that was representing the sheriff's

17  office in the prosecution of a civil forfeiture proceeding that

18  had been brought in tandem with a criminal proceeding against

19  our clients.

20           Now, both the criminal proceeding and the forfeiture

21  proceeding, and the civil proceeding here, all arise from

22  precisely the same facts, although the response to our papers

23  is that those are different.  I think if -- there's no question

24  but that the basic underlying facts -- the arrests of our

25  clients, the charging of our clients -- all arise from the same

PDF created with pdfFactory trial version www.pdffactory.com

1  facts.   And our concern in this regard is that you have

2  essentially government lawyers who are prosecuting the civil

3  forfeiture now coming into a civil case and using their

4  position as government lawyers, and all the resources of the

5  government, in order to aid and assist in the prosecution of

6  the civil case.   That is the concern.

7           The rules could not be, I don't think, more clear in

8  that regard, that government lawyers are simply not to do that.

9  If Your Honor is working in the state attorney's office and is

10  working on a matter, then Your Honor can't then leave the state

11  attorney's office and take on representation of the victims

12  because there is this appearance -- even though you may not in

13  fact be using any confidential information -- there is

14  certainly the appearance that you've used the good offices of

15  the state attorney to advance the civil cause of the -- of the

16  victims in that case.   And that, to us, is precisely what we

17  have going.   We have either the actual or the appearance of

18  that happening in the case.

19           Now we raised that, and Mr. McCloy was very candid in

20  his response, indicating, yes, my firm does represent the

21  sheriff's office, and yes, I personally have been involved in

22  that representation.   I've participated in the development of

23  the strategy, I've been in the depositions in the case, but his

24  view was that -- that it doesn't matter because he doesn't

25  regard that as somehow related to the civil case.

1    Well, our clients see it very much directly related

2    because it's all the same facts and circumstances, and they are

3    concerned about the fact that the government's resources are

4    being used on them in the civil case.

5    Mr. McCloy raised -- responded to my letter only after

6    Judge Rodgers had entered the stay in the case.  And there is

7    something of an argument that is made here that we've waited

8    too long and we've waived this argument by waiting and not

9    moving at the time.

10    And yes, we certainly could have moved to lift the

11    stay in order to ask Judge Rodgers at the time to conduct a

12    disqualification proceeding at the outset.  But frankly, since

13    the stay had been entered, we regarded all matters in the civil

14    case as stayed, and it seemed as though the stay was going to

15    be in place for a fairly healthy period of time, and it seemed

16    to us to be premature to be pursuing a disqualification matter

17    when there was much water that was to pass under the bridge in

18    the criminal case before we would resume any sort of litigation

19    in this case.  So we --

20    THE COURT:  What government assets, specifically, were

21    misused by the plaintiffs' attorneys?

22    MR. JULIN:  I do not know that in fact any government

23    assets were misused.  Obviously we do not have access to

24    whatever information the Harrison Sale firm has had access to

25    in its representation of the sheriff's office.  Obviously that

PDF created with pdfFactory trial version www.pdffactory.com

1    is a confidential relationship.  They would have an

2    attorney/client privilege.  They would have their work product

3    privileges.  They have acknowledged that they have been given

4    access to the videotapes that were seized.  These videotapes

5    are not publicly available materials.  These -- they are

6    alleged to be contraband.  They are alleged to be -- have been

7    made in violation of the federal child pornography statutes and

8    the state child pornography statutes, and these are certainly

9    materials that are not available to the general public, or to

10   civil attorneys, certainly not at this time.

11          Now, they may ultimately become available to civil

12   attorneys, but certainly that is one piece of -- that is one

13   government asset, if you will, that the -- that the Harrison

14   Sale firm has had access to, through its representation of the

15   sheriff's office, and which is of direct relevance and

16   materiality to the issues in this case.  This depicts what

17   transpired.  I haven't seen these materials myself, so I'm at a

18   loss to describe exactly what it is, but it certainly is

19   alleged that these were materials that were made at the time

20   that the incidents giving rise to the arrest and giving rise to

21   the criminal prosecution and giving rise to the civil

22   forfeiture proceedings.  And again, it's very -- it's very much

23   within the mainstream of, I think, the Bar rules that prohibit

24   use of that sort of inside government information, and indeed

25   it is confidential information in terms of being accessible to

PDF created with pdfFactory trial version www.pdffactory.com

1    others.

2             THE COURT:  These were your clients' tapes, weren't

3    they?

4             MR. JULIN:  Well, that is what I am told.  And I

5    believe that to be true.

6             THE COURT:  Well, did you do anything to confirm that?

7             MR. JULIN:  I have not -- I have not confirmed whether

8    they are our clients' tapes or not.  I accept their

9    representations that they are our clients' tapes and our

10   clients know what's on those materials.

11            That does not change the fact that here you have

12   government lawyers who have special governmental access to that

13   information that is not available to other lawyers who might

14   wish to undertake the representation of those victims, and

15   they're using that in order to, first, draft a complaint

16   against our clients, and then to continue the prosecution of

17   the action.

18            I mean, that's -- it's not really material, in my

19   view, that our clients are able to ascertain what's on the

20   material, because that's not the prejudice that's done -- that

21   they have some access that we don't have access to.  The

22   prejudice is that it's government lawyers using their

23   government positions to advance a civil claim

24            THE COURT:  You need to tell me how they have used

25   material in the possession of the state attorney's office and

1    the sheriff's office to further the civil litigation.

2              MR. JULIN:  Well, the -- the furtherance of it, as we

3    see it, is that they have drafted a civil complaint; that --

4    and again, I don't have access, obviously, to all of the

5    information they have, in terms of how they have retained their

6    clients, how they ascertained the identities of the alleged

7    victims.  As you see from the pleadings in this case, the

8    identities of the victims, or the plaintiffs in this case, is

9    not alleged, and that, presumably, is something that can only

10   be ascertained from the materials that are in the possession of

11   the government, and that is how the complaint appears to have

12   been drafted.

13             Now, is it possible that they've somehow else learned

14   of the identities?  I suppose it is possible.  But I don't

15   believe that any of the case law requires a showing of actual

16   use of government assets to further --

17             THE COURT:  You've told me about access to the tapes.

18             MR. JULIN:  Yes.

19             THE COURT:  Access to the identities.

20             MR. JULIN:  Yes.

21             THE COURT:  What else?

22             MR. JULIN:  That's all that I have any knowledge of

23   and that's because they have told us that they have had access

24   to that.  I don't know what other information they have from

25   either the sheriff's office or the state attorney's office by

PDF created with pdfFactory trial version www.pdffactory.com

1    virtue of their representation of the sheriff's office because

2    that's all privileged, confidential information.

3              THE COURT:  Wouldn't they have the identity of their

4    own clients from the time the client called and said, "I want

5    an appointment to see if you'll represent our family and our

6    child in a civil case"?  I mean aren't they -- I mean, that

7    sort of strikes me as common sense.  They're going to know the

8    identity of their own clients, and don't need access to the

9    prosecution material -- unless you're suggesting that they got

10   the identities and went out and solicited business.

11             MR. JULIN:  I am making no claim in that regard.  And

12   I think Your Honor is -- we're all speculating here, because

13   we're talking about a confidential relationship that they have

14   with the sheriff's office.

15             THE COURT:  Mr. Julin, you are the one who, when I

16   asked you specifically --

17             MR. JULIN:  Yes.

18             THE COURT:  -- how were they misusing this government

19   information --

20             MR. JULIN:  Yes.

21             THE COURT:  -- who brought up the question of the

22   identity.

23             MR. JULIN:  Yes.

24             THE COURT:  As if they would not have had that

25   information otherwise.

1       MR. JULIN:  They certainly would not have had the

2    tapes themselves.  And the tapes -- they depict what happened

3    there -- would allow a lawyer to evaluate whether a civil claim

4    exists, would allow a lawyer to draft a civil claim, would

5    allow a lawyer to proceed with the civil claim, as was done,

6    and commence a civil action during the time that the criminal

7    action was pending, and to then use the criminal action to try

8    to coerce a resolution of that civil case.

9           And so it may not be that they learn of the identity,

10   or need to have the identities from the tapes themselves, but

11   in order to evaluate whether there is a claim, and whether what

12   their clients are telling them actually happened, they see on

13   those government-seized tapes exactly what transpired, and then

14   draft a complaint from that.

15          I think that that is the use of government assets that

16   would be prohibited by the rule.  But it's not -- again, the

17   rules are not confining this to simply actually taking

18   government material and then using it to help a civil litigant.

19   The government lawyer who is in that relationship and is

20   representing the government and has that special confidential

21   access can't simply then go into the civil representation and

22   say, oh, I'm not using anything that I learned by virtue of my

23   office, because it creates this appearance that that is exactly

24   what is happening.  And the rules are very much concerned as

25   much with the appearance of impropriety as they are with the

1    actual impropriety itself.

2         That is the summary of our presentation.

3         THE COURT:  All right.  Thank you.

4         MS. BEVINGTON:  Good morning, Your Honor.  My name is

5    Elizabeth Bevington.  I'm an attorney with Holland & Knight,

6    and I'm here representing Mr. Ross McCloy and Thomas Dent, who

7    is the counsel for the plaintiffs in this action.

8         One little housekeeping matter before I begin, Your

9    Honor.  I put together a notebook of just the primary

10   authorities, the actual rules that have been cited, and three

11   of the cases, and I've also prepared a summary on one page of

12   the rules that are cited in the defendant's motion, and I've

13   shared that with the defendants, and if it would be useful to

14   the court, I have a copy for the court as well.

15        THE COURT:  All right.

16        MS. BEVINGTON:  May I approach the bench?

17        THE COURT:  Yes, please.

18        MS. BEVINGTON:  Your Honor, the one-page summary is in

19   the pocket part of the front of that.

20        THE COURT:  I have that.

21        MS. BEVINGTON:  Your Honor, I'm frankly a little bit

22   at a loss for the things that I've heard this morning.  We --

23   in the motion that has been filed by the defendants, there are

24   very serious allegations against two attorneys, who, if we put

25   on the testimony, Your Honor, you will hear that they have a

PDF created with pdfFactory trial version www.pdffactory.com

1    conbined 62 years of practice of law without ever being accused

2    of any ethical violation, without ever having a motion to

3    disqualify filed against them

4              And we have in these pleadings some very, very serious

5    allegations of serious ethical violations, with cases cited

6    that refer to attorneys who have multiple ethical violations

7    from which the court concluded that there was a pattern of

8    dishonesty and of taking money from partners and from clients,

9    so that the allegations could not be more serious, Your Honor.

10             And frankly I would, and I think most lawyers would,

11   agonize over bringing these kind of allegations.   And

12   certainly, all of the rules, and all of the duty of candor to

13   the court requires lawyers to do a very thorough investigation

14   of two things:   What law applies and whether the law really

15   does apply to the situation that they're bringing to the court;

16   and number two, the facts that will support that law.   And

17   there has been an utter and complete failure on both sides of

18   those issues, Your Honor, with this -- with this -- with the

19   filing.

20             In the brief -- and I will briefly go over some of the

21   cases and some of the comments that have been made in the

22   opening.   But in the brief, the cases that are cited --

23   particularly with respect to the disqualification issue --

24   cases are cited from 30 and 40 years ago, from other

25   jurisdictions, one of which acknowledges that they do not apply

1    the Rules of Professional Conduct, which do apply in Florida.

2         And they fail to bring to the court's attention the

3    Davis case, which is from 2002, and which is precisely on

4    point, and which as a matter of fact, one of Mr. Julin's

5    partners participated in that case.  I'm sure -- I find it hard

6    to believe that counsel would not have been aware of the case.

7    And I think it is a serious breach of the duty of candor to the

8    court to not bring that case to this court's attention.

9         I would like to start with the motion to stay, Your

10   Honor.  The issue that is really before the court with respect

11   to the motion to stay is primarily whether the language of the

12   ruling of Judge Rodgers was clear and ambiguous.

13        Now you will hear from Mr. McCloy and from Mr. Dent,

14   that they understood Judge Rodgers to have said -- to have

15   asked the question, "You will issue this subpoena promptly,

16   will you not?"  And that they understood that comment to be an

17   acknowledgement that Judge Rodgers shared with them the concern

18   that there might be some destruction of documents, and that it

19   would be important to do this subpoena in a timely fashion.

20   Unfortunately, it fell through the cracks.

21        The most important thing -- as Your Honor has read

22   that transcript -- the most important thing about that hearing

23   was to preserve or to assure that the videotapes that had

24   already been distributed with respect to one of the plaintiffs

25   were retrieved from the marketplace.  That was the primary

PDF created with pdfFactory trial version www.pdffactory.com

1    objective.   And in the days following the hearing, that

2    objective was accomplished, and frankly, the subpoenas slipped

3    through the cracks.

4         But the question of whether the judge's ruling, about

5    the promptness of the issuance of the subpoena, whether that

6    meant, as Mr. Julin apparently suggests, that if too much time

7    went by, that exception from the stay would expire, doesn't

8    seem to me as reasonable interpretation as the judge sharing

9    the concern about the destruction of documents.

10        But, assuming that both interpretations are

11   reasonable, that means that the ruling was in fact ambiguous.

12   And the cases that are cited by both of the parties suggest in

13   order for there to be a contempt of any kind of an order, the

14   order itself has to be clear and unambiguous.   The very dispute

15   about the meaning of the timeliness suggests that that hasn't

16   been met.

17        Mr. Julin has mentioned in his opening that the --

18   that the scope of the subpoena was broader than he expected.   I

19   think he described himself as being surprised.   Again, the

20   ruling of Judge Rodgers would have to be clear and ambiguous.

21   And certainly it was not memorialized in anything other than

22   her oral ruling.   But Mr. Dent, when he first mentioned the

23   subpoena -- and that's on page 23 of the transcript -- his

24   first mention of what he intended to do in the subpoena is that

25   he -- what he said was, "Other concerns of ours are that if

PDF created with pdfFactory trial version www.pdffactory.com

1    we're going to delay civil discovery for some period of time,

2    that all discoverable materials be preserved wherever they

3    reside."  That's his first mention.

4         Now later he mentions videotapes, and later he talks

5    about broad-based subpoenas.  So the question of what that

6    subpoena was designed -- there's really no reason for it to

7    have been limited to videotapes.  And certainly that was not

8    the understanding of either Mr. Dent or Mr. McCloy.  So again,

9    this is -- at best, it renders the ruling ambiguous.

10        Turning the court's attention to the disqualification.

11   This disqualification that the defendants are trying to raise

12   is subject to 4-1.11.  Under the terms of that rule, Your

13   Honor, it requires that there be knowing use of confidential

14   government information obtained -- acquired at the time that

15   the lawyer was a public officer of -- or employee.  And I want

16   to deal with that issue first, and then I will take up the

17   confidential government information.

18        The plain meaning of being a public officer or

19   employee means somebody who is actually working with the

20   government.  You will hear from Franklin Harrison that he was

21   outside counsel, that this was not successive government and

22   private employment, he was not working interminably with the

23   government and then went outside of the government and used

24   that information for a civil use.  These were concurrent

25   representations in Mr. Harrison's private capacity and

1    Mr. McCloy's private capacity.

2           The important thing about that is the defense cites

3    to -- for example, Handelman v. Weiss, which is a 1973 case out

4    of New York, and in Handelman, they say, we're not bound by the

5    Rules of Professional Conduct, and you know what, we don't like

6    this successive government part, we think concurrent

7    representation is enough and we're not applying those rules and

8    we're not bound by them

9           They failed to cite the case, the Davis vs. Southern

10   Bell & Telephone, which was from 1993 -- I misspoke earlier,

11   Your Honor, it wasn't 2002.  And that case states the obvious,

12   and I quote, on page 674 and again on 677, what the court said:

13   "On its face, Rule 1.11(b) applies only to successive, not

14   joint, representation."

15          So I would suggest that the rule on its face doesn't

16   apply.  But I would invite the court to go farther, as the

17   Davis court did, and look to see whether or not this really is

18   confidential government information that was at stake here.

19          Now, Mr. Harrison will testify that in a civil

20   forfeiture proceeding the Rules of Civil Procedure apply.  And

21   the minute that the government uses any of their confidential

22   government information in the context of a civil forfeiture

23   proceeding, all of that information becomes subject to a plain

24   discovery request from the opposing party, which is the same

25   parties that are represented in this action here today.  And in

PDF created with pdfFactory trial version www.pdffactory.com

1    fact, that discovery request was made, and in fact, all of

2    those tapes that were viewed by Mr. Harrison, were passed on to

3    counsel.  They would all become public record at that point.

4            There was one exception, there was one reason why

5    they're not available for the public to review, and that's

6    because they're pornographic and they depict minors in

7    pornographic activities.  But that kind of restriction on

8    public access is not what this rule is about.

9            What this rule is about is the confidential government

10   investigative materials that the public would not otherwise

11   get.  The truth is, counsel for the defendants in this case

12   asked for those documents and saw every bit of those documents.

13           In addition to that, under the Rules of Criminal

14   Procedure, at the time that counsel for these defendants issues

15   a discovery request in the criminal matter, the bigger universe

16   of all of the things seized by the sheriff -- because the civil

17   forfeiture documents were a smaller subset of what had been

18   seized, and that's all that Mr. Harrison and Mr. McCloy dealt

19   with.  There was a bigger universe of all of the tapes and all

20   of the documents.  All of those documents also become public

21   record the minute that the criminal defense counsel issues

22   discovery requests for it.

23           Now, it didn't become available to the public, again,

24   because it was pornographic materials depicting minors -- in

25   some cases minors, some cases not.  So because of that, there

PDF created with pdfFactory trial version www.pdffactory.com

1   were restrictions.  But certainly, counsel for the defendants

2   had full access to all of these documents.

3           Now Mr. Julin has said that he's never viewed them,

4   but that's not because he couldn't go over there and view them.

5   That's because he never chose to do that.

6           Mr. McCloy will testify that he mentioned on numerous

7   occasions, "Have you been over to see any of the tapes?"  And

8   Mr. Julin said he really was not interested at this stage to

9   view those tapes.

10          THE COURT:  Let me ask you, the statement you made

11  that under the Florida Rules of Criminal Procedure when the

12  defendant makes a discovery request, that the information

13  becomes available to  the public --

14          MS. BEVINGTON:  That is correct, Your Honor, that's my

15  understanding of the way the rules operate.

16          THE COURT:  And that it did not in this case, or a

17  certain amount of it did not, because it depicted the minors?

18          MS. BEVINGTON:  That's correct.

19          THE COURT:  That information that did not depict the

20  minors in some fashion or identify them would have been

21  accessible by the public?

22          MS. BEVINGTON:  Correct, Your Honor.

23          Your Honor, in the context of this disqualification,

24  there is one other case that was cited, that I think is, again,

25  another violation of the duty to candor to the court, there's a

PDF created with pdfFactory trial version www.pdffactory.com

1  citation to <u>Zarco Supply Company</u> for the proposition that the

2  disqualification under 1.11 should be imputed to everybody in

3  the law firm, and a citation to this case.  You look at that

4  case and look at the rule that it cites, which is 1.1 --

5  1.1 lists every disqualification rule as to which imputing to

6  the entire law firm is appropriate, and 1.1 is not among them

7  That case is simply inapplicable.  And I mean it's not a very

8  sophisticated analysis to come to that conclusion.

9          It -- you know, I think we'll find, and I think we've

10  already heard multiple admissions of a failure to do an

11  investigation, but I think we will find Mr. Julin never called

12  the sheriff's office to see what we could see, never called the

13  sheriff's office to find out if the sheriff would tell him what

14  Mr. Harrison had viewed or what Mr. McCloy had viewed, and

15  simply failed in his obligation to investigate the facts

16  underlying this proposition.  The law doesn't apply and the

17  facts don't support his allegations.

18          Your Honor, with respect to the question of

19  interference with the criminal matters, this is an interesting

20  issue because the rule itself, which is 4.3, states that a

21  lawyer shall not present, participate in presenting, or

22  threaten to present, criminal charges solely to obtain an

23  advantage in a civil action.

24          We have seen today for the first time the

25  transcriptions of the two phone calls that -- between Mr. Julin

1    and Mr. Dent.  And we think there is certainly a factual issue

2    with respect to what might have been said in those

3    conversations, and maybe something that we need to explore in

4    this hearing.

5            I will say, you know, what is really remarkable about

6    those phone conversations is that Mr. Julin admits that at the

7    time that the phone conversations took place, he was in the

8    final draft -- in fact it was the day after the final phone

9    call that this motion was filed.

10           So while he's speaking to Mr. Dent, he is transcribing

11   the notes, he's pressing Mr. Dent for more information, asking

12   him questions in different ways, writing it all down for the

13   purpose of putting it in this motion, and during those phone

14   calls never once satisfied his ethical obligation under Local

15   Rule 7.1 to try to have a good faith conference about any of

16   these issues, and to clarify them in that way.  He was lying in

17   wait, he kept it a secret, he took notes about this, and that's

18   the real basis of his motion, the only thing that he brings to

19   the court today where he says he has any evidence.

20           The other thing is that the rule itself, on its face,

21   talks about being involved in threatening to present or

22   presenting the criminal charges.  The state criminal charges

23   have been pending in this case way from the beginning, and

24   obviously Mr. Dent had no participation in that.  I didn't

25   understand until today that Mr. Julin is suggesting that

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Dent was somehow threatening to participate in the

2    presentment of the federal criminal charges.  I was surprised

3    to hear Mr. Julin say that he was unaware of that, because the

4    fact that the FBI and the grand jury proceedings all came to

5    light in the depositions of the young girls, both in the

6    criminal matter and in the forfeiture matter, both of which

7    things Mr. Julin would have had access to.

8         So the fact that he was not aware of that was, you

9    know, no secret to anybody else.  You know, it was -- the fact

10   that he chose not to participate in those depositions, and

11   apparently has not gotten the transcripts, which should have

12   been made available to them

13        With respect to whether there was this, quote,

14   "interference" with the plea agreement, the rule says that you

15   cannot present or participate in presenting.  There's nothing

16   in this rule that says that when you represent the victim of a

17   crime that you have no right to be concerned about a plea

18   agreement.

19        If the Florida Bar wanted to prevent that kind of

20   activity, they could have done that in this rule, but they

21   didn't do that.  And issues about whether or not there is going

22   to be restitution to the victims and whether or not the victims

23   are satisfied with the plea agreement are always important to a

24   prosecutor.

25        So I am kind of at a loss at what it is Mr. Julin is

PDF created with pdfFactory trial version www.pdffactory.com

1    suggesting -- you know, the real facts of what he suggests was

2    wrong about anything that took place, with the exception,

3    again, of this -- of these two phone calls.

4            There is a few things that have not been mentioned

5    today, and I think, you know, they bear -- they bear

6    mentioning.  And one is part of what was alleged in the

7    original briefing by the defendants, was that there was an

8    alleged threatened media campaign, and that Mr. Dent had

9    threatened the state attorney and others that, you know, if

10   this plea agreement went forward, that, you know, he was going

11   to hire a media consultant and that he was going to bring all

12   of these things out in the press and embarrass the state

13   attorney.  That never happened.  And the defendants now know

14   that that didn't happen.

15           The defendants have now done the investigation that

16   Mr. McCloy and Mr. Dent did after this motion was filed, and

17   have uncovered the source of that alleged rumor, and they

18   uncovered it the day before yesterday, not before they filed

19   this motion, but the day before yesterday.  And so we have

20   heard nothing about it and we will hear nothing more about it.

21   I mean I -- I assume that those allegations have been

22   withdrawn.  But I think it's important for the court to know

23   that the factual basis on which they have decided to withdraw

24   those allegations was uncovered by them weeks after this motion

25   was filed in clear violation of their duties to this court, to

1    the counsel, to the Bar and to the administration of justice.

2          I didn't hear anything in the opening statement about

3    this alleged forum shopping.  But, you know, I will say that

4    the only case that's cited in support of, you know, this being

5    a violation, was a case in which a lawyer had 61 ethical

6    violations and he had filed one case, then filed another one

7    simultaneously and didn't tell either court that these two

8    cases were pending.  That's not at all what happened in this

9    case, and I think Mr. Julin recognizes that.

10          It's important to note that with respect to the

11   disqualification issue, they knew all of these facts 28 months

12   ago.  With respect to the alleged forum shopping, they knew all

13   of these facts 27 months ago.  With respect to the other

14   disqualification, which we didn't hear anything more about this

15   morning, the competition for assets, they knew about that 28

16   months ago.

17          The explanation about why, when the subpoena was

18   received, Mr. Julin didn't just pick up the phone and call

19   Mr. McCloy and say, you know what, I think this is broader, I

20   think it's untimely, maybe we should go back to the court, why

21   he didn't do any of that is completely missing from the papers.

22   And again that's an obligation.

23          THE COURT:  Doesn't that cut both ways?  And isn't

24   that sort of a problem here?  I mean that's simply an absence

25   of communication that may have prevented an awful lot of this;

PDF created with pdfFactory trial version www.pdffactory.com

1    that when the realization came that a subpoena had not been

2    issued, and that it looked like criminal case was going to be

3    resolved, wouldn't a phone call to Mr. Julin saying, "Now don't

4    have heart failure, but we're getting ready to send these

5    subpoenas out; we forgot to do it"?  Wouldn't that have headed

6    this off, and likewise, I guess, a phone call from Mr. Julin

7    saying, "What are you doing?"

8                MS. BEVINGTON:  Your Honor, I was not in the head of

9    the lawyers who filed the subpoena.  I do know -- and you will

10   hear from the testimony -- that the news about this -- the

11   imminent plea agreement, which was what reminded them, you

12   know, we haven't done this, and maybe, you know, this means

13   that some of the documents are going to be lost, came just a

14   day and a half or so before the plea agreement was supposedly

15   going to be announced, and so there was a lot going on.  The

16   families were upset.  Mr. Dent, of course, was not in town, and

17   so I think things happened more quickly.

18                You know, if Mr. McCloy had called Mr. Julin and said

19   "I'm sending this," would that have resolved it?  Maybe it

20   would have.  And maybe that would have been the better

21   practice, would have been to take the time to do that.

22                Of course the rules -- you know, he felt like he was

23   fulfilling something that had been permitted under a court

24   ruling, that had never been objected to by the defendants, and

25   it never occurred to him that the defendants would be pointing

PDF created with pdfFactory trial version www.pdffactory.com

1   at that as something that indicated that they were trying to,

2   you know, quote, unquote, "interfere" with this plea agreement.

3          And certainly, you know, Rule 7.1 doesn't require the

4   good faith conference prior to issuing a subpoena, which -- as

5   to which there is a good faith belief that you have the

6   entitlement to issue.

7          THE COURT:  I see that the transcript of that hearing

8   before Judge Rodgers in February '04 was prepared

9   November 22nd, '05.  Was this something that the parties had,

10  the lawyers had, in their possession?

11          MS. BEVINGTON:  As of November of '05?  I don't know,

12  Your Honor.  I would have to ask Mr. McCloy that, but I would

13  assume it was transcribed at that time, that it was available

14  to counsel.

15          THE COURT:  Or was this simply just reposing in the

16  court or court reporter?

17          MS. BEVINGTON:  We'll have to ask Mr. McCloy that in

18  his testimony.

19          THE COURT:  It appears the transcript was available if

20  anybody had gone back and looked to refresh their

21  recollections.  Okay.

22          MS. BEVINGTON:  Your Honor, in closing, I would just

23  mention that I counted one, two -- I counted three times during

24  his opening statement where Mr. Julin admitted that some of the

25  facts are subject to speculation and that it was on information

1    and belief and/or, you know, the investigation was not done,

2    Your Honor, and I -- I just, you know, urge the court to

3    consider how inappropriate it is to raise these kind of very,

4    very serious ethical allegations against a member of the Bar

5    when, you know, a simple investigation would have resolved some

6    of the factual issues, and indeed there is obligations to the

7    court and to the Bar to have conducted those investigations.

8              Thank you, Your Honor.

9              THE COURT:  All right.  All right, Mr. Julin, you may

10   proceed with your presentation of evidence.

11             MR. JULIN:  Your Honor, in terms of documents, we have

12   previously lodged with the court a request for judicial notice

13   of two sets of documents, and Your Honor has granted those.  We

14   would rely on those, and I would offer those same documents in

15   evidence at this time to the extent that you regard that as

16   necessary, since you have indicated you will judicially notice

17   those documents, which are primarily the documents from the

18   criminal proceedings that show the context of what was

19   happening there, then I would offer those, if you feel that

20   those are necessary to be offered, in addition to the request

21   for judicial notice.

22             THE COURT:  We've already taken judicial notice of it,

23   but --

24             MR. JULIN:  All right, Your Honor, beyond that, the

25   testimony I would give really is set forth in the declaration

1   that I have filed, and Mr. Davidson will call me as a witness

2   if you regard that as necessary or appropriate to confirm the

3   testimony that I already have provided in the declaration.

4           THE COURT:  Well, I -- this is an evidentiary hearing,

5   and I think you need to present your testimony, and the

6   plaintiff is going to have an opportunity at cross-examination.

7           MR. JULIN:  Very good, Your Honor.

8           MR. DAVIDSON:  Your Honor, Barry Davidson, Mr. Julin's

9   partner.

10          Judge, I might comment, because I'm going to

11  anticipate making this offer in regard to the testimony of

12  Mr. McCloy and Mr. Harrison.  One middle ground -- and whatever

13  Your Honor prefers -- is to simply proffer Mr. Julin's

14  testimony as set forth in his declaration and offer him up for

15  cross-examination.  If Your Honor would prefer, direct is not

16  going to take very long.

17          THE COURT:  I think we need to have a direct

18  presentation.  And let's do it in that fashion.

19          Krissy, there's no need for the lawyers to be sworn

20  under oath.  They're officers of the court.

21      THOMAS R. JULIN, DEFENSE WITNESS, AND OFFICER OF THE COURT,

22  TESTIFIED AS FOLLOWS:

23                          DIRECT EXAMINATION

24  BY MR. DAVIDSON:

25  Q.  Please state your name and business address for the record.

1    A.    My name is Thomas R. Julin, and my business address is 1111

2    Brickell Avenue, Miami, Florida.

3    Q.    And what is your occupation?

4    A.    I am a partner of the law firm of Hunton & Williams.

5    Q.    What is your involvement with the case before Your Honor?

6    A.    I am -- I've been hired to represent the four defendants in

7    this case, Joe Francis, MRA Holding, Mantra Films, and Aero

8    Falcons.

9    Q.    And Mr. Julin, was there a time earlier this year that you

10   became aware that plaintiffs in this civil case before Judge

11   Smoak issued subpoenas to the Bay County State Attorney's

12   Office and the Bay County Sheriff's Office?

13   A.    Yes.   That was -- I did become aware of that in January of

14   2006.

15   Q.    And what date did that occur, as best you recall?

16   A.    My recollection is I became aware of it on the date of the

17   subpoenas, January 25th.

18   Q.    And was there an event affecting our client, Mr. Joe

19   Francis, that took place the next day?

20   A.    I subsequently learned that Mr. Francis had planned to come

21   to Florida to appear in the -- in a criminal proceeding and to

22   plead guilty to at least one of the charges in that proceeding.

23   Q.    All right, Mr. Julin, that was late January?

24   A.    I believe it was January 26th, that I learned that

25   Mr. Francis was planning to come, on the 26th or the 27th, to

1    plead guilty.   That was immediately after the subpoena was

2    issued to the state attorney's office and the sheriff's office.

3    Q.   When, after that information, did you have your first

4    discussion, if any, with any of the counsel for the plaintiffs?

5    A.   After that, the only conversation that I had with

6    plaintiffs' counsel was with Mr. Dent when he called me on

7    March -- I believe it was 21st -- of 2006, just out of the

8    blue, to discuss settlement of the civil case.

9    Q.   And I think it's clear from the record, but just to be

10   safe, Mr. Dent is --

11   A.   Tom Dent was and is representing the plaintiffs in the

12   civil case that has brought -- been brought against the -- our

13   defendants in this case.

14   Q.   All right.   And he's with Seyfarth & Shaw in Chicago?

15   A.   My understanding is he's a partner with Seyfarth & Shaw in

16   Chicago, yes.

17   Q.   Who called who?

18   A.   Mr. Dent called me.

19   Q.   And what did he say?

20   A.   He said that he had had a conversation with Mr. McCloy

21   about the need to mediate the case, that he understood that the

22   local rules required that most civil cases be mediated.   And I

23   was surprised he was talking about that because we had

24   previously talked about settlement, and that had gone nowhere,

25   and it didn't seem as though there was any possibility of that

PDF created with pdfFactory trial version www.pdffactory.com

1   happening.

2        But then the next thing that he said was, "I don't know if

3   you're aware of it, but there is a federal criminal

4   investigation of your clients that also is pending," and I, in

5   fact, was not aware of that before Mr. Dent had advised me of

6   that.   And this gave me some alarm that he was mentioning this

7   in the context of trying to resume a settlement discussion.

8   And it became clear to me in that conversation, then, that he

9   was trying to threaten to use the continuation of the state

10  criminal case and this new federal investigation to coerce a

11  settlement of the civil case.

12  Q.   Mr. Julin, the comment "it became clear to you" is your own

13  mental impression.   Do you recall any specific words he used

14  that led you to that conclusion?

15  A.   He said that we could "kill two birds with one stone" was

16  one of the exact quotes that he used in the first telephone

17  conversation that I had with him

18  Q.   Did he make any reference to his previous experience as an

19  Assistant United States Attorney, as a prosecutor?

20  A.   He said that attorneys that are familiar with criminal

21  cases know that if the victims resolve any sort of civil

22  claims, then that is often something that will resolve the

23  criminal case.   And again, that really sent a very strong

24  message to me.   My impression was that he was saying that his

25  clients would cooperate with us in trying to resolve the

PDF created with pdfFactory trial version www.pdffactory.com

1    criminal case, and this new federal case, if we would simply

2    pay them the money that they wanted to resolve the civil case.

3    Q.   All right, what else took place in that conversation,

4    Mr. Julin?

5    A.   He asked me if we were interested in discussing this

6    further.   I told him that we previously had been -- had been

7    interested in having a settlement discussion, and that I would

8    discuss it with my clients, and that I would get back to him

9    And I did not ask him questions.   I did not try to prompt him

10   to make any of these statements to me.   It was really a very

11   one-sided conversation.   I would say 90 percent of the talking

12   was done by Tom Dent telling me that he wanted to get this

13   thing going, and that he thought that this was a particularly

14   opportune time for my client, given that there was this federal

15   investigation that was out there, and it might be resolved if

16   we could settle the civil case.

17   Q.   Did you take any notes of this telephone conversation,

18   Mr. Julin?

19   A.   I did.   I was taking notes.   My general practice, when I

20   talk to someone on the phone, is to -- because my computer is

21   sitting right in front of me -- is to take notes of what I am

22   hearing on the phone, so that I can remember later what

23   happened in the telephone call.

24   Q.   And when is the last time you reviewed those notes?

25   A.   I reviewed them last night.

1   Q.   And is your testimony to Judge Smoak this morning

2   consistent with what your notes told you?

3   A.   Yes, it is.

4   Q.   What happened next, Mr. Julin, in regard to any contact

5   with Mr. Dent?

6   A.   I called him the following day.   He had -- and I called him

7   because in that first conversation he was not clear about what

8   sort of a settlement he was looking for, and obviously our

9   clients would like to resolve the civil case.

10      And I called him and I asked him if he could give me any

11  clearer indication of what sort of a settlement he was looking

12  for.   And he indicated that he was looking for a settlement in

13  the millions.   He also indicated that the plaintiffs were very

14  much motivated to settle, and that they were linked arm in arm,

15  they all wanted to settle for one sum, he didn't want to

16  negotiate over one plaintiff or another plaintiff, which was a

17  problem for us because our view is that some had stronger cases

18  than the others.   But he said that they were all linked and

19  that they all wanted to settle.

20      And he again brought up the topic of the maturity of the

21  federal investigation, that there apparently had been a grand

22  jury investigating and felt that, you know, because of that, it

23  should give some motivation to our clients to settle the civil

24  matter.

25  Q.   Did he make any comment, do you recall, about the federal

1    indictment?

2    A.   He said something to the effect that the indictment was

3    forthcoming, or would be coming out shortly, and he very much

4    wanted to get together immediately so that we could have this

5    discussion and try to settle the civil case before there was a

6    federal indictment, and was saying that his clients would be

7    helpful in getting that resolved.

8    Q.   Same questions, Mr. Julin, with regard to notes of that

9    second conversation.

10   A.   Yes.   I took notes of that conversation as well.

11   Q.   And your review of the notes last night, your testimony

12   today, same answer as before?

13   A.   Yes, I reviewed those notes last night and I noted various

14   typographical errors in there because I just took them very

15   quickly as we were talking to the phone there.

16          MR. DAVIDSON:   Your Honor, I don't know that there's

17   any issue about the earlier exchange of correspondence between

18   Mr. Julin and Mr. McCloy back in late 2003.   I think that's in

19   the record.

20          MS. BEVINGTON:   It was submitted in connection with

21   the affidavit and we have no objection.

22          MR. DAVIDSON:   Okay.   With that, then, I would tender

23   Mr. Julin for Your Honor's questions and questions from

24   counsel.

25          THE COURT:   Ms. Bevington?

1          MS. BEVINGTON:   Thank you, Your Honor.

2                    CROSS-EXAMINATION

3     BY MS. BEVINGTON:

4     Q.   Mr. Julin, the subpoenas were served on you in late January

5     of this year, is that correct?

6     A.   There was a copy that was faxed to me, I think at the same

7     time that they were served on the state attorney's office and

8     sheriff's office.

9     Q.   They were faxed to you?

10    A.   That is my recollection.

11    Q.   So you had immediate notice?

12    A.   I did have immediate notice of those subpoenas, yes.

13    Q.   And have you reviewed those in preparation for your

14    testimony today?

15    A.   I have looked at the subpoenas, yes.

16    Q.   Okay.  Did the subpoenas call for immediate production of

17    any documents?

18    A.   No, they didn't.  And that was one of the concerns that I

19    had, is they didn't specify a date.  They simply said to

20    produce the material at a date to be agreed, so we didn't know

21    when they would be produced, whether immediately or some time

22    thereafter.

23    Q.   Didn't the subpoena say that the time and place for

24    production was to be agreed upon between the parties to this

25    action and the state attorney's office?  Isn't that what the

1  subpoena said?

2  A.   I don't have the subpoena in front of me, but I'll accept

3  your representation of what it says.

4  Q.   Would you like to confirm that, Mr. Julin?

5  A.   I would be glad to accept your representation.

6  Q.   You don't recall reading that at the time, then, is your

7  testimony; that you didn't realize that it would take your

8  agreement in order for this production to take place?

9  A.   Well, it was not clear to me from the subpoena that that

10  was intended to refer to us as a --

11  Q.   So when you read that, "The time and place to be agreed

12  upon between the parties to this action" -- which is John Doe

13  and Joe Francis -- your testimony is you didn't understand that

14  that included your client?  Is that correct?

15  A.   It was not at all clear to me that we were going to be

16  called and that we would be able to say, no, don't produce

17  these materials.  Here's a subpoena served on the state

18  attorney's office, and for all I knew, at the time, the state

19  attorney's office, that day, was going to produce the

20  materials.  But it wasn't really so much the production of the

21  materials that was of concern to me; it was really when I

22  learned later that there was this plea agreement, it was the

23  effect of the subpoena on the state attorney as willingness to

24  go forward with the plea agreement that was the problem

25          THE COURT:   Ms. Bevington, will you show the subpoenas

1    to Mr. Julin, and Mr. Julin would you identify anything in

2    those subpoenas that you think was unclear?

3            THE WITNESS:   It says -- it does say, "time and place

4    to be agreed upon between the parties to this action and the

5    state attorney's office."  And, again, it was not clear to me

6    that the -- that this meant that nothing would be produced

7    before we consented to have the state attorney's office produce

8    these materials.

9            THE COURT:   What did you do to get clarification of

10   your concern?

11           THE WITNESS:   Well, I didn't do anything to clarify

12   that because I learned immediately afterwards that the plea

13   agreement that had been negotiated -- and again, I was not a

14   party to the plea negotiations -- but I learned from the

15   lawyers who were involved in that, that the negotiations had

16   been destroyed, that for some reason the state attorney did a

17   180, and while the state attorney had been very agreeable to

18   going forward with the negotiated plea on the day prior to the

19   issuance of the subpoena, that on the day of, or immediately

20   after the issuance of the subpoena, that the state attorney had

21   called and had said, "We're not going through with this

22   anymore."  And so it seemed to me that we had a fait accompli

23   on our hands, that the subpoenas had been issued in violation

24   of the stay, which we thought was in place, and that it had had

25   the intended effect of blowing up the plea deal.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:   Are you saying that the subpoena spooked

2     the state attorney and he reneged on the plea agreement?

3          THE WITNESS:   That was my impression and that was the

4     information that was conveyed to me by the attorneys who were

5     involved in the plea negotiations.

6          THE COURT:   You talked to Jimmy Judkins and Hank Cox,

7     and did they tell you that the subpoenas spooked the state

8     attorney?

9          THE WITNESS:   I did not speak to them   I spoke to

10    Larry Simpson and Aaron Dyer, who are the criminal defense

11    attorneys for the defendants in that proceeding, and they had

12    spoken to the state attorney's office who had given them this

13    information.

14         THE COURT:   I'm sorry.

15         MS. BEVINGTON:   Thank you, Your Honor.

16    BY MS. BEVINGTON:

17    Q.   And did you make a call to the state attorney's office to

18    try to confirm this information?

19    A.   I did not.   That was --

20    Q.   Okay, and did you make a call to Mr. McCloy to try to

21    determine what, if anything, he had done with respect to the

22    subpoena production?

23    A.   I did not contact him about the -- about when the materials

24    would be produced because, again, it wasn't so much a question

25    of the production of the materials as the threat that the

1    subpoena appeared to present, that all of those materials at

2    some point would be obtained by Mr. McCloy, and then used to

3    demonstrate that the state attorney had entered into a plea

4    agreement that the plaintiffs did not regard as justified.

5    Q.    You are, of course, familiar with the Local Rule 7.1?

6    A.    Yes.

7    Q.    And you -- you would admit that you did not comply with

8    that Rule 7.1 with respect to the motion that was filed in this

9    case?

10   A.    Well, that's something that we evaluated whether it was

11   necessary to do that.  Obviously we were moving for an order to

12   show cause why they shouldn't be held in contempt for having

13   violated the stay.  They had, in our view, violated the stay.

14   There was nothing to ask them to do anymore at that point.

15       Ordinarily when I would call to consult with someone about

16   will you take some action or not, there's some reason to call

17   them, and in this regard, here, there didn't seem to be any

18   reason to call them, since they had already done the thing that

19   I was -- had to complain about, that they had violated the

20   stay.  And the other thing that we had to complain about, the

21   disqualification, we had consulted them about that much

22   earlier, and they had refused to disqualify themselves and they

23   had invited us to file a motion.

24   Q.    Mr. Julin, you did in fact talk to Mr. Dent -- I think your

25   testimony is -- a couple of days before you filed your motion

1   for contempt and for disqualification; that's correct?

2   A.   That is correct.

3   Q.   And he called you the first time on March 21st, correct?

4   A.   That's correct.

5   Q.   And I think you had testified that you -- was it you that

6   had initiated some settlement discussions earlier on in the

7   case?

8   A.   Earlier, in October.

9   Q.   In October of 2005?

10  A.   Of 2005.

11  Q.   Okay.

12  A.   And my recollection was October 14th, I had called him --

13  Q.   I'm not really asking you about the details, and I think it

14  would be better if we didn't go into that, but I just wanted to

15  confirm that you had initiated settlement discussions --

16  A.   That is correct.

17  Q.   -- four months before this telephone conversation?

18  A.   That is correct.

19  Q.   And so Mr. Dent called you to discuss the -- continued the

20  settlement discussions, is that not correct?

21  A.   Well, I mean I wouldn't say it was a continuation, because

22  after I had called him on October 14th, there had been -- it

23  very quickly became clear, from the exchange of letters, that

24  our respective clients were extraordinarily far apart in their

25  views of how the case should be settled.  And Mr. Dent and I

1    agreed that it would be utterly futile to continue any sort of

2    discussion of settlement of the case.  And that's why I was

3    surprised when he called me back in March to try to resume the

4    discussions.

5    Q.   Well, isn't it true that in a prior conversation with

6    Mr. McCloy, that you yourself raised the settlement

7    opportunities, in 2006; isn't that true?

8    A.   I don't have a specific recollection today of that.

9    Q.   Okay.  How many plaintiffs are there in this case?

10   A.   You'll have to tell me.  I know that there's the --

11   Q.   Let's not discuss any of them  You don't recall, as you

12   sit here today, the actual number of plaintiffs, is that

13   correct?

14   A.   I'm thinking that it's seven.

15   Q.   I think that would be right.

16   A.   And I know that -- and there's some hesitation because

17   there's the parents and there's also the women -- the children

18   of the parents, and so I'm not sure whether both are --

19   Q.   Okay.  And I think your testimony was that some of the

20   claims are stronger than others?  Is that what your testimony

21   is?  Is that not correct?

22   A.   Yes, that's correct.

23   Q.   And isn't it true that as to at least one of the

24   plaintiffs, there was widespread distribution of pornographic

25   materials with respect to this -- one of the individuals, isn't

1      that true?

2              MR. DAVIDSON:   Your Honor, this is far beyond the

3      scope, and more important, it has nothing to do with this

4      hearing.   We're going into the merits of the underlying

5      lawsuit.

6              MS. BEVINGTON:   Your Honor, there's been a suggestion

7      that the discussion about the settlement was somehow an

8      extortionment discussion.   And Mr. Julin himself admitted that

9      some of the claims were stronger than others.   I merely wanted

10     to point out to the court that there are seven plaintiffs, and

11     as to some of them the claims are extremely egregious, but I

12     think Mr. Julin -- I'll withdraw the question.

13             THE COURT:   Overruled.

14             THE WITNESS:   So the question was --

15             MS. BEVINGTON:   I'm withdrawing the question.

16     BY MS. BEVINGTON:

17     Q.   Now after you had that initial conversation with Mr. Dent,

18     you were -- you were in the process at that time of drafting

19     the motion.   I think you admitted that to the court.   You had

20     that motion on your desk.

21     A.   The motion was well underway, and the final decision as to

22     whether to file the motion had not been made.

23     Q.   Did you make that final decision?

24     A.   I was -- I participated in that with our clients.

25     Q.   So it was just you and your client?

1   A.   Well, it was me, and certainly Mr. Simpson and Mr. Dyer and

2   the client were all involved in making the decision to file the

3   motion.

4   Q.   The criminal defense lawyers were involved in making the

5   decision about the motion that you filed?

6   A.   They were very much involved in it, yes.

7   Q.   Did you have a discussion, then, with all of them after you

8   had that first conversation with Mr. Dent on March 21?

9   A.   I did.

10  Q.   And did they suggest to you then that you call him back on

11  March 22nd and see what else you could get to put into this

12  motion?

13          MR. DAVIDSON:   Your Honor, excuse me, but that

14  question calls for invasion of the attorney/client privilege,

15  and I would be happy to speak to why we are proceeding in a

16  very narrow fashion here today, Your Honor.

17          THE COURT:   Well, let's not get into the

18  communications with the client, but --

19          MR. DAVIDSON:   But, Judge, communications between

20  counsel who are all representing a common interest, in this

21  case the same client, are equally protected.

22          MS. BEVINGTON:   Let me pose the question a different

23  way, Your Honor.

24  BY MS. BEVINGTON:

25  Q.   Mr. Julin, when you called Mr. Dent back the second day,

1    your intent in making that conversation had nothing to do with

2    truly exploring any settlement activities; your intent was to

3    try to elicit some statements that you could use in the motion,

4    is that not correct?

5    A.   That is not correct.   Actually, our clients were very much

6    interested in settlement, and very much interested in knowing,

7    as specifically as we could possibly learn, what was the level

8    of settlement that was being sought, and quite frankly, the

9    earlier conversation, I think, had a very serious impact on our

10   clients, in terms of the criminal case, because here we had a

11   lawyer who was telling us that he could help us to get rid of

12   the criminal case, and therefore they wanted to know what was

13   the price.

14   Q.   Mr. Julin, let me go ahead and ask you about this -- about

15   those statements.   Now, Mr. Dent spoke in terms of the

16   importance of restitution in resolving a criminal case, is that

17   not correct?

18   A.   No, he didn't mention restitution.   He mentioned that they

19   wanted millions of dollars.

20   Q.   He didn't mention that the resolution of the matters with

21   the plaintiffs would be significant in the criminal matter?

22   A.   Yes.   He mentioned --

23   Q.   Okay, all right, thank you, Mr. Julin.   That's -- you know,

24   that's what I thought I understood your testimony to be.

25        Now, he had mentioned that there was a requirement for a

PDF created with pdfFactory trial version www.pdffactory.com

1    mediation in the federal civil case, did he not?

2    A.   Yes, he did.

3    Q.   And so when he said, in your words, as you wrote down on

4    these notes, "killing two birds with one stone," it is just as

5    likely, is it not, that what he was referring to with the two

6    birds with one stone is to resume the settlement discussions

7    and dispose of the mediation obligation; isn't that correct?

8    A.   I didn't understand it to be limited in that regard.

9    Q.   But you didn't ask him about that, then?  I don't see

10   anything in your notes asking him to clarify that.

11         MR. DAVIDSON:  Your Honor, respectfully, may the

12   witness be allowed to answer the question before another

13   question comes?

14         THE WITNESS:  I was listening to what he had to say to

15   me, and he was telling me that if we would pay his clients what

16   they wanted, that his clients would help to resolve the

17   criminal case.

18   BY MS. BEVINGTON:

19   Q.   Well, if -- it seems to me, have you -- you say you have

20   reviewed your notes about that conversation?

21   A.   Yes.

22   Q.   And there's nothing in those notes that say that, is there?

23   A.   He didn't use those precise words.  He used the words that

24   you see in the notes.

25   Q.   So it is your inference, Mr. Julin --

1    MR. DAVIDSON:  Your Honor, I apologize, but counsel is

2    not letting Mr. Julin complete his answers.

3          THE COURT:  All right, let's wait until we get a

4    period at the end of a sentence before we -- somebody else

5    talks.

6          THE WITNESS:  And the words that he used conveyed to

7    me, exactly as I've testified, that his clients would help to

8    resolve the criminal case if our clients would pay his clients

9    what they wanted.

10   BY MS. BEVINGTON:

11   Q.   But you didn't write those precise words down because he

12   did not say those precise words, correct?

13   A.   Well, I believe I've testified.  That's correct, yes.

14   Q.   So it was your inference from his suggestion that a

15   settlement would be helpful?  Is that correct?

16   A.   There wasn't much of an inference to be made.  He said that

17   they would give favorable -- have to show me the notes for me

18   to again use his exact words, but he was saying that they would

19   give favorable recommendations to the prosecutors in those

20   cases that would resolve the matter.

21         MS. BEVINGTON:  May I approach the witness?

22         THE COURT:  Yes.

23   BY MS. BEVINGTON:

24   Q.   Could you point out to me where you say that Mr. Dent said

25   that his clients would give favorable recommendations to the

1    prosecutor to resolve the criminal case?

2    A.    Yes.    This -- these are my notes from the second day, the

3    second telephone conversation that I had with him    And -- and

4    this is -- it's not every word that was said during the

5    conversation because as I was talking and he was talking, I

6    would just take down some of the things he said.

7              MS. BEVINGTON:    May I interrupt, Your Honor?    The

8    reason I interrupt the witness is because he didn't answer the

9    question.

10    BY MS. BEVINGTON:

11    Q.    The question is:    Can you point to the words from which you

12    drew the inference -- and I want you just to read the words

13    from which you drew the inference -- that Mr. Dent had said

14    that his clients were going to provide favorable input to the

15    prosecutor?

16    A.    Really, the words that most directly conveyed that is that

17    -- I took a note "would want to get some positive."    And what

18    he said was that the prosecutors would want to get some

19    positive input from his clients.    And his offer was that they

20    would do that if we resolved the civil case in the manner that

21    he wanted, which was -- and he said "millions, for the seven

22    girls."

23    Q.    Well, thank you, Mr. Julin.    We'll take this up with

24    Mr. Dent.

25              I would say, though, the only words that you wrote down

PDF created with pdfFactory trial version www.pdffactory.com

1    about everything that you say that you inferred were, and I

2    quote, "would want to get some positive."  That's the only

3    thing in your notes that refers to everything that you've just

4    testified to, is that correct?

5    A.   It's really all of the notes together.  If you read it all

6    together, I think it's very clear what the intention was.

7    Q.   Now, I want to turn your attention to the -- to your access

8    to the documents that were in the sheriff's office, okay?  You

9    say that you have had conversations with the criminal lawyers

10   that are representing your clients?

11   A.   With Mr. Dyer and Mr. Simpson, yes.

12   Q.   And did they not explain to you that they had issued a

13   discovery request and that all those documents would be

14   available to you to review?

15           MR. DAVIDSON:  Your Honor, same objection as to

16   privilege.  If the question could be recast to what happened,

17   that would solve the problem

18           THE COURT:  Well, one problem is, Mr. Julin, early on,

19   brought up the communication he got from those lawyers when the

20   plea deal was withdrawn.  I think he's opened the door to --

21   for this to some degree.  I'm going to allow that question.

22           THE WITNESS:  I'm sorry, could you repeat the

23   question?

24   BY MS. BEVINGTON:

25   Q.   The question was:  Did they not explain to you that they

1    had sent a -- a discovery request in the criminal matter which

2    made all of those documents at the sheriff's office available

3    for your review?

4    A.   I don't recall the specifics of -- you know, I wasn't

5    involved in the criminal case, and so what they were reviewing

6    and what they were not reviewing -- they may have told me that,

7    but I frankly don't have a recollection of whether they did.

8    Q.   But you've made an allegation in this case that these

9    lawyers should be disqualified because they have access to

10   documents that are confidential as to which you did not have

11   access to.   And my question to you is, you didn't check, then,

12   with the criminal lawyers to confirm the accuracy of that

13   allegation?

14   A.   Well, the documents may have been available to our lawyers,

15   but they weren't available to the public generally.

16   Q.   They weren't available to the public because they were

17   pornographic depictions of minors; isn't that accurate?

18   A.   Well, I believe that the state -- my  understanding is the

19   state attorney's office has taken the position that those

20   materials -- not that they're pornographic, but that they are

21   child pornography, and that they're contraband, and that they

22   are not allowed to be shown to anyone, and that they are not --

23   they've only been shown to the lawyers for the state attorney's

24   office, and I don't frankly know whether they were shown to the

25   lawyers for the criminal case, but if members of the public or

1    other lawyers went down do see them, I don't think they would

2    be allowed to see them

3    Q.   Did you ever try to see them?

4    A.   I had no need or occasion to try to see them, and no, I

5    didn't.

6    Q.   So you can't tell the court today that you did not have

7    access?

8    A.   I'm not claiming that I didn't have access.

9    Q.   You're claiming that the public didn't have access.   But

10   the truth is, they didn't have access because there was child

11   pornography included in the materials; is that accurate?

12   A.   That's the state attorney's claim   There hasn't been, as

13   far as I know, an adjudication of whether the materials would

14   meet the standards that they would be withheld from the public

15   or not.

16        THE COURT:   Mr. Julin, did you make any inquiry about

17   who would have access to the material in the possession of the

18   state attorney?

19        THE WITNESS:   I did not make any inquiry to the state

20   attorney's office because, again, the lawyers in the criminal

21   case, Mr. Dyer and Mr. Simpson, were telling me that those --

22   that the state's claim was that these materials could not be

23   released to anyone in the public, because the charge in the

24   case was that the making of the videotapes, and what they

25   depicted, all violated the state and federal criminal laws, and

1    that the state attorney was not about to release to the public

2    any of those materials.

3              THE COURT:  Well, prior to filing this motion, once

4    you were headed in that direction, did you conduct any

5    investigation or make any inquiry to determine accurately who

6    had access to the material in the control of the state

7    attorney?

8              THE WITNESS:  The only investigation that I made was

9    to inquire of Mr. Simpson and Mr. Dyer as to whether -- as to

10   what was happening with those materials.  And they conveyed to

11   me that the state was keeping all of those materials, was not

12   releasing them to the public, and I had no reason to doubt that

13   that was the case because the charges in the criminal case were

14   that they violated the federal laws and that the federal laws

15   prohibited the distribution or even the possession of the

16   materials.

17             THE COURT:  When did you make that inquiry?

18             THE WITNESS:  That was early on in the case, really.

19             THE COURT:  Not in connection with this motion?

20             THE WITNESS:  Not in connection with this motion.

21             THE COURT:  Okay.

22   BY MS. BEVINGTON:

23   Q.  Mr. Julin, you have attached a letter that you received

24   from Mr. McCloy that's dated February 19, 2004, to your

25   affidavit.

1   A.   That's correct.

2   Q.   Did you review this letter before you filed the motion that

3   we're here on this hearing about?

4   A.   Yes.

5   Q.   And in this letter, it states -- Mr. McCloy reminds you

6   again, "My understanding is that both the criminal defense

7   lawyers and the civil defense lawyers are able to view the same

8   tapes that I viewed by simply requesting permission from the

9   state attorney's office and lining up a date and time to do so

10  with the sheriff's office."  Did you read that?

11  A.   Yes.

12  Q.   But you never tried to confirm whether that was accurate?

13  A.   I did not make any further inquiry of the state attorney's

14  office, no -- any inquiry.

15  Q.   Now, Rule 4-1.11 contains a definition of confidential

16  government information, is that correct?

17  A.   I believe that is correct.

18  Q.   And I assume that you reviewed that rule to determine

19  whether your motion was justified?

20  A.   Yes.

21  Q.   The rule itself is entitled Successive Government and

22  Private Employment, is it not?

23  A.   Yes, it is.

24  Q.   And what information -- what evidence can you present to

25  the court today that there was successive and private -- public

1    employment in this case?

2    A.   Well, I'm not sure how to interpret your question.

3    Q.   Well, let me rephrase it for you.  You have no evidence to

4    suggest that either Mr. Harrison or Mr. McCloy were an officer

5    or an employee of the sheriff's office or the state attorney's

6    office at the time that they had access to any information

7    regarding this case, do you?

8    A.   My understanding is that they were attorneys for the

9    sheriff's office.

10   Q.   So it's your interpretation of the rule that as attorneys,

11   outside civil attorneys, that they become a public officer or

12   employee?  Is that what you're testifying?

13   A.   I think they do, yes.

14   Q.   Okay, and the Davis case notwithstanding, that would still

15   be your testimony?

16   A.   I think that is correct, yes.

17   Q.   Who is Mr. Bellamy?

18   A.   I've been told he is a public relations person of some

19   sort.

20   Q.   And when you made your allegations in the motion that you

21   filed with this court, that Mr. Dent had hired a public

22   relations person to conduct a national media campaign to

23   intimidate the state attorney's office, the information that

24   you had been told about Mr. Bellamy was the basis for that

25   allegation, is that not correct?

1    A.   I don't -- I didn't know at the time that it was about

2    Mr. Bellamy, and I'm frankly not sure today whether it is about

3    Mr. Bellamy or about someone else.

4    Q.   So you had no idea when you filed that who it was about?

5    Is that correct?

6    A.   My information was from Mr. Simpson, and from Mr. Dyer,

7    that the state attorney's office had conveyed to them that

8    Mr. Dent had made these threats.

9    Q.   Did you check that out to see if it was true?  Did you call

10   the state attorney's office?

11   A.   I did not do anything other than speak to Mr. Simpson and

12   to Mr. Dyer, who conveyed to me that it was true.

13   Q.   But two days ago you talked to Mr. Bellamy, or somebody on

14   your behalf spoke to Mr. Bellamy, is that not correct?

15   A.   I personally spoke to Mr. Bellamy because that was the

16   first time that I had a name of someone that was supposed to be

17   involved in this threatened campaign.

18   Q.   Okay, so you did some investigation, and you got

19   Mr. Bellamy's name?

20   A.   I did.

21   Q.   That was weeks after you filed this motion, wasn't it?

22   A.   Yes, it was.

23   Q.   And then when you talked to Mr. Bellamy, he set you

24   straight that he had never been hired by Dent for any national

25   media campaign, isn't that true?

1    A.   He claimed that he had not been retained by Mr. Dent and

2    had not spoken to Mr. Dent and was not involved in any sort of

3    campaign.

4    Q.   So as a result of that, you decided not to push this

5    national media campaign, correct?

6    A.   Well, I'm not sure what you mean by not push.   The problem

7    was not so much that there was anything inappropriate with

8    Mr. Dent telling the state attorney's office, if that happened,

9    that he was going to engage in this campaign.

10        The problem that our client had was that, for whatever

11   reason, the state attorney's office was maintaining the

12   prosecution, and now Mr. Dent was attempting to use that to

13   coerce a settlement of the civil case.

14        So it really wasn't all that -- it was important to me

15   because Mr. Simpson was telling me, look, the state attorneys

16   are telling -- explaining to us that they have withdrawn the

17   plea agreement because of their concern that there will be this

18   massive campaign that is conducted by the plaintiffs and by

19   Mr. Dent to try to make it appear as though the plea agreement

20   was a bad deal.

21   Q.   So your information on which you filed the motion before

22   this court was based on hearsay, and when you did do your

23   investigation and spoke eventually to Mr. Bellamy, he told you

24   that it was not true that Mr. Dent had hired him?  This is a

25   simple yes or no question.

1   A.   Yes, that is correct.

2   Q.   Now, Mr. Julin, as part of your oath, of course, as a

3   member of the Bar, you have sworn to uphold the rules of

4   professional conduct, correct?

5   A.   Yes.

6   Q.   And as part of that rule -- of those rules, when any

7   attorney becomes aware of serious ethical infractions, they

8   have an obligation to report those, do they not?

9   A.   Yes, they do.

10   Q.   So you have brought some very serious ethical infractions

11   to the attention of the court, some of which -- three main

12   allegations of which occurred more than 28 months ago.   Have

13   you satisfied your obligations to the Bar to report these

14   ethical violations?

15   A.   Not yet.   But I agree with you, I think I do have an

16   obligation to report it to the Bar, and I will do that.   But

17   the Bar typically doesn't act on matters that are in

18   litigation, and so it didn't seem to me appropriate to report

19   it at this time.

20   Q.   You've made an allegation in your motion, Mr. Julin, that

21   there is a violation of Local Rule 77.3.   Are you familiar with

22   that allegation that you made?

23   A.   Yes.

24   Q.   And you had absolutely no firsthand facts on which to base

25   an allegation that either Mr. Dent or Mr. McCloy ever made an

1   extrajudicial comment in violation of that rule to any member

2   of the media, do you?

3   A.   Well, that -- it was clearly threatened, according to

4   Mr. Simpson and Mr. Dyer.

5          MS. BEVINGTON:   Could I have just a moment, Your

6   Honor?

7          That's all I have, Your Honor.

8          THE COURT:   Mr. Julin, let me ask you something on

9   that point, about 77.3, which talks about extrajudicial

10   communications by attorneys.

11          THE WITNESS:   Yes.

12          THE COURT:   If an issue that is not relevant or

13   material to the judicial proceeding, or the issue at hand, is

14   nonetheless included in the filing, is it given the same

15   protection as that it is simply part of the court proceeding

16   and, in your view, not subject to this rule?

17          THE WITNESS:   That would be my reading of the rule,

18   that that speaks to extrajudicial rather than matters that are

19   filed with the court.

20          THE COURT:   So matters that are spurious or irrelevant

21   or immaterial, though submitted to the court, but for whatever

22   reason get considerable extrajudicial attention, you think the

23   rule still doesn't prohibit that?

24          THE WITNESS:   Well, I think the language of the rule

25   is clearly talking about extrajudicial statements by the

1    lawyers, and if the lawyers are making statements in the

2    matters that are filed with the court, whether they're material

3    or immaterial, I guess the rule itself doesn't deal with that.

4    And I think the reason for that interpretation of the rule is

5    that they -- the rules basically leave it to the court to deal

6    with the matters that are filed.

7         THE COURT:  Doesn't it talk, the rule -- the one thing

8    that it says the lawyers are supposed to stay away from, in

9    extrajudicial communications, and that's about the testimony

10   and credibility of witnesses?  Is that --

11        THE WITNESS:  In the context of extrajudicial

12   statements.

13        THE COURT:  Let me tell you what concerns me, that in

14   the hours before your motion was filed, there was unusual

15   attention here by the media wanting to know if something new

16   had come in.  Did you, or anybody associated with your defense

17   effort, communicate to the media that you were going to be

18   filing that motion?

19        THE WITNESS:  I did not have any communications.

20        THE COURT:  My question is, did you or anybody to your

21   knowledge?

22        THE WITNESS:  I understand your question very clearly,

23   and I did not.  And whether anyone else, other defense lawyers

24   or criminal lawyers, I have no knowledge about any

25   communications that anyone had with the media.  And, in fact, I

1    didn't even know that the Panama City News Herald had reported

2    about this until the response was filed to our motion.

3         THE COURT:  Let me take it to the next step,

4    Mr. Julin, because you devoted six pages in that motion to the

5    lack of credibility of the young women.

6         THE WITNESS:  Yes.

7         THE COURT:  Would you tell me why that is relevant to

8    the issues that you are raising about the attorney misconduct?

9    Because I have not made that connection, and I am very

10   concerned that under the guise of a court filing, that an

11   effort was made, by laying out all of the details of -- about

12   the credibility of the young women, that that was an effort to

13   communicate to the public.  You understand why I'm concerned?

14        THE WITNESS:  Yes, I do very much understand your

15   concern, and I understand the --

16        THE COURT:  You seem to have devoted more pages to

17   their credibility than any single issue or subissue in that

18   motion.

19        THE WITNESS:  And I can explain to Your Honor the

20   reason for that.  The -- as we were trying to decide whether to

21   file this motion based on the issuance of these subpoenas,

22   there was a -- there was a -- a feeling that I had, and that

23   the other lawyers that were involved in this had, that you,

24   Your Honor, you needed some context for this.

25        And if I may, the -- the concern about the publicity

1   was really -- there was a real concern that putting all this

2   information forth, including the information that Mr. Francis

3   was about to plead guilty to something, was something that was

4   hardly favorable to the defense side of this matter.  And --

5   but the feeling was that without that context of both that a

6   plea agreement that was reasonable had been resolved, and that

7   there was about to be a plea, without that context, the

8   issuance of the subpoenas in violation of the stay, in our

9   view, would be regarded as something of a technical matter,

10  when in fact it appeared to me and to the others working with

11  us, that this was not just simply a technical matter and effort

12  to preserve evidence, but in fact a real effort to stop a plea

13  agreement, that was a reasonable plea agreement, from going

14  forward, so that that pendency of the criminal case could then

15  be used.  And it was really only --

16          THE COURT:  Well you interestingly did not include any

17  of the terms of the plea agreement in your motion, did you?

18          THE WITNESS:  We did not include the details of the

19  plea agreement, that is correct, Your Honor.

20          THE COURT:  Why would the substance of the plea

21  agreement be at all material for my consideration; and beyond

22  that, why would the testimony of the alleged victims be at all

23  material in the issues that you have raised about the conduct

24  of the attorneys?

25          THE WITNESS:  I believe it is material and relevant to

1    the matters here as to whether the -- it shows the seriousness

2    of the violation of the stay.

3            THE COURT:   What does it prove?

4            THE WITNESS:   What it proves is that there was a

5    reason -- I'm not sure "proves" is the right word, but it

6    certainly seems to me to be evidence that bears upon whether

7    there was a reasonable plea that was being put into place, that

8    there were some weaknesses in the state's case, and that in

9    order to disrupt that, that there were these subpoenas issued

10   out of a federal civil case to the state attorney's office that

11   really communicated to the state attorney, we're going to take

12   your entire file and we're going to publicize this in the event

13   that that plea goes forward.

14           That was the thinking as to why Your Honor would

15   need -- or be interested in what was happening at all in the

16   criminal case.   And without that context, it didn't seem to us

17   to be something that you could deal with, and it would seem to

18   be simply a -- well, they're issuing subpoenas to the state

19   attorney's office in order to preserve evidence, when that was

20   not what seemed, from the timing of this, to be happening at

21   all.

22           THE COURT:   And apparently it didn't register on you

23   at the time the language on the subpoena that said -- requiring

24   at a time and place to be agreed upon by the parties and the

25   state attorney's office?

1          THE WITNESS:  Well, I didn't -- I didn't interpret

2     that to mean that we would have veto power and that we could

3     stop the issuance of these.   I did see that we now might have

4     to object to this and we'd have to lift the stay and all of

5     that, and it just seemed to me that this was, send -- more

6     intended to send a message to the state attorney than anything

7     else; that we're going to take all your material and publicly

8     expose it and try to discredit the plea agreement.   And I think

9     that's what happened.

10          I truly, Your Honor, believe that's precisely what

11     happened, because of everything that you've heard today.

12     There's no other real explanation of why the state attorney all

13     of a sudden decided to back out of this deal.   I think they had

14     the intended effect.

15          THE COURT:  Mr. Julin, did you make any inquiry to

16     determine the established practice of the state attorney's

17     office in getting the input of crime victims before a proposed

18     plea agreement is put into effect?

19          THE WITNESS:  I did speak with Mr. Simpson and

20     Mr. Dyer about what is done, and that the state does consult

21     with the victims about their view.   And --

22          THE COURT:  Did you ever try to make inquiry directly

23     with the state attorney's office to determine why the plea

24     agreement was withdrawn?

25          THE WITNESS:  I'm not a criminal defense lawyer and

1    I've not been involved in the criminal matter or had any direct

2    dealings with the state attorney's office, and the reason was

3    that our client wanted the criminal defense lawyers to deal

4    directly with the state attorney's office and not have the

5    lawyers that were defending the civil case calling the state

6    attorney's office and perhaps doing something that the criminal

7    defense attorneys would know was not the way to deal with state

8    attorneys.  And I don't know how to deal with state attorneys

9    in criminal matters.  That is something that we had delegated

10   to Mr. Simpson and to Mr. Dyer.

11           THE COURT:  Did you ever determine whether the state

12   attorney's office has an established practice that if the

13   victim objects that -- to a particular proposed plea agreement,

14   it will not go forward with that agreement?

15           THE WITNESS:  What was communicated to me by

16   Mr. Simpson was that the state attorney had communicated with

17   the victims about this and that at least one of the victims had

18   concerns about the plea agreement, and intended to speak at the

19   plea agreement, but that the state attorney also communicated

20   that that was not the basis for the state attorney's decision

21   to back out of the plea agreement, that it was the context that

22   Mr. Dent had and the threats that were made about what would

23   happen if the plea agreement went forward in terms of a public

24   relations campaign and so forth.

25           Again, this is all information that's provided to me

PDF created with pdfFactory trial version www.pdffactory.com

1    by Mr. Simpson and Mr. Dyer.  It is not firsthand information

2    that I have.  And that was the basis of our filing.

3            THE COURT:  Did they tell you that they were

4    communicating directly with Dent?

5            THE WITNESS:  The state attorney's office told

6    Mr. Simpson, yes, that they were communicating directly with

7    Dent, and that it was exactly in this time frame.  Mr. Dent's

8    declaration confirms that on January 26th, that he did in fact

9    call the state attorney's office, and I don't know exactly the

10   sequence of when the decision was made, but it was the 26th or

11   the 27th that the state said, we're not going forward with

12   this.

13           And so everything that I was getting from Mr. Simpson

14   and from Mr. Dyer, it seemed as though there was this

15   deliberate effort to stop the plea arrangement from going

16   forward.  But again, that was not really so much my concern as

17   the fact that there was these subpoenas that were issued in

18   violation of the stay.

19           THE COURT:  Those were in January.

20           THE WITNESS:  And the same -- to the same --

21   January 25th, the subpoena is issued and January 26th, I

22   believe, it is, I was told the state attorney decides, we're

23   not going forward with this.  Mr. Francis had been scheduled to

24   come and to actually appear and plea on the 26th or the 27th,

25   and then he didn't come because he was told the deal is off,

```
 1    the state attorney has been scared off by whatever it was that

 2    Mr. Dent conveyed to them

 3              THE COURT:  What did you do when you learned of those

 4    subpoenas to seek protection or to make the court, this court,

 5    aware of what you believed to be a violation of the stay order?

 6              THE WITNESS:  Well, immediately I didn't do anything

 7    because I didn't appreciate what was the significance --

 8              THE COURT:  You didn't do anything for two months.

 9              THE WITNESS:  Well, I did.  I did obviously convey to

10    our clients that the subpoenas had been issued, and it was then

11    that I learned of the -- what they claimed to be the impact on

12    the state attorney's office, and it seemed that the -- those

13    subpoenas, in conjunction with whatever communications, had

14    stopped the plea agreement.  That's how it appeared, and still

15    appears to me that that's what happened.

16              And then there was this question about, well, shall we

17    present this to the federal district court at this point in

18    time?  The plea had been destroyed by what appeared to have

19    happened.  So there was no immediate need to run in and say,

20    okay, stop them from issuing.  They had already issued the

21    subpoenas and violated the stay.  And so we had some time

22    within which to compose something that would give you the full

23    context of what had happened.

24              THE COURT:  You said that you all were concerned that

25    the material would be used in a smear campaign.
```

1          THE WITNESS:   Yes.

2          THE COURT:   And you've said that apparently the tight

3    language on the subpoenas didn't register on you, that it

4    apparently called for an agreement by the parties before the

5    subpoenas would require a response.

6          THE WITNESS:   Well, it says "time and place to be

7    agreed upon between the parties," but it didn't seem to me that

8    it said to the state attorney's office, "Don't produce this

9    until we give you further information."   I mean ordinarily when

10   a subpoena is served on someone, the --

11         THE COURT:   It specifies a time and place.

12         THE WITNESS:   Ordinarily it would.

13         THE COURT:   And these did not, did they?

14         THE WITNESS:   They did not provide a time and place,

15   but again --

16         THE COURT:   If you were concerned that that production

17   was going to be made and that it would violate the stay, I need

18   for you to explain why you did not promptly take action rather

19   than waiting two months.

20         THE WITNESS:   And the reason was that it was not so

21   much the concern about the production of the materials, the --

22   initially I was concerned about the production of the

23   materials, but then it appeared to be that the subpoenas were

24   issued in order to communicate to the state attorney and to the

25   sheriff's office that if you -- if you go forward with this

PDF created with pdfFactory trial version www.pdffactory.com

1   plea, then we're going to take all your materials and we're

2   going to use them in this campaign.

3          And so that having been -- and then the state attorney

4   backed out of the deal as of January 26th or 27th, and

5   thereafter there wasn't an immediate need to deal with whether

6   the state was going to produce the materials or not.  The real

7   problem was that they had issued the subpoenas, they had had

8   had the intended effect of destroying the plea agreement, or so

9   it appeared.  And then, you know, the final, the straw that

10  broke the camel's back, in terms of the decision to file, was

11  the telephone calls from Mr. Dent where he's connecting the

12  pendency of the criminal case and the impending federal case to

13  this, and that's when the final decision was made, let's

14  present all of this to the federal district judge so that it

15  can be aired and considered as to whether this is

16  inappropriate.  And the objective, frankly, Your Honor, was to

17  prevent the civil lawyers from continuing to interfere in the

18  criminal case.

19          THE COURT:  So you were concerned that the civil

20  lawyers, under the guise of judicial action, were attempting to

21  accomplish an improper end extrajudicially?

22          THE WITNESS:  Yes.  And there's one other point that I

23  think that's important.  I think they clearly knew that they

24  couldn't do what they were doing because there had been three

25  attempts to lift the stay, first before Judge Rodgers, there

1    was an initial effort that was denied.

2              THE COURT:  I'm familiar with that.

3              THE WITNESS:  Motion for reconsideration.  And then

4    finally came back to you and asked Your Honor to have a status

5    conference on January 11th, I believe it was.  And then there

6    was not immediate action on that, and notwithstanding that the

7    stay had three times not been lifted, they decided to go

8    forward and to issue the subpoenas.  And that's -- that was

9    really why it seemed very much to me that this was an improper

10   thing that was happening and that the court should see that.

11             THE COURT:  Why didn't you dial the phone and say,

12   "McCloy, what's going on with these subpoenas?  Don't you know

13   that violates the stay?"

14             THE WITNESS:  Because the subpoenas had -- had already

15   had the -- apparently -- the intended effect; that if I had

16   called Mr. McCloy and said, "What are you trying to accomplish

17   here?" and whether he said, "Well, I'm just trying to preserve

18   the evidence," or whatever, it really wasn't of much

19   consequence, since the sequence and the timing, from the

20   perspective of our client was, that whatever is the explanation

21   for this, the -- it has accomplished an interference with the

22   criminal case in direct violation of the stay.  And after

23   repeated efforts to lift the stay had been rejected, they went

24   ahead with it anyway.

25             THE COURT:  Did your two criminal defense colleagues

1    learn of the subpoenas from you, or did they learn from some

2    other source?

3              THE WITNESS:  I sent it to them, and I -- I frankly

4    don't know whether they had it also from some other source.

5              THE COURT:  I could see your point if they call you

6    and said, "Julin, we just found out these guys in your case are

7    sending subpoenas out and they've spooked everybody."

8              THE WITNESS:  Yes.

9              THE COURT:  But you're telling me you told them about

10   it.

11             THE WITNESS:  I told them about the subpoenas, and

12   then they told me about how that had spooked it.  And there

13   were communications between Mr. Simpson and the state

14   attorney's office about, as you can imagine, "What happened?

15   We had a deal."  And that's when they get all this information

16   from the state attorney's office.

17             THE COURT:  They tell you the state attorney said, "We

18   pulled the plea agreement because we got subpoenas"?

19             THE WITNESS:  Not because we got subpoenas, but

20   because there had been this threat that they're going to go and

21   put people on talk shows, and they're going to publicize this

22   matter and attack the state attorney, and the state attorney

23   will never be elected to public office again if he goes through

24   with this plea agreement.

25             It's that type of information, and it's then when we

1   put two and two together, and we said, well, if you're making

2   that type of a threat and simultaneously subpoenaing not only

3   these videotapes, but also all of the investigative files, all

4   the interviews, all of the analysis of the case that's been

5   done, that it seemed like that was all part of a plan to spook

6   the state attorney and then to continue to use that criminal

7   case to press a resolution of the civil case.

8           THE COURT:  It's your name on this motion, and you're

9   the one here testifying today, and you went totally on what

10  apparently your two colleagues handling the criminal case were

11  telling you.  You didn't call the state attorney's office

12  yourself.

13          THE WITNESS:  That's correct.

14          THE COURT:  To pose the question.  You didn't call

15  Dent and say, "What's this about you guys making threats?"

16          THE WITNESS:  Yes.

17          THE COURT:  And you didn't call McCloy?

18          THE WITNESS:  That's correct.

19          THE COURT:  Okay.  And you didn't call the Bar.

20          THE WITNESS:  I have not yet called the Bar.  I

21  understand my ethical obligation to report that, and I believe

22  I do have an ethical obligation to report that, and I do

23  intend --

24          THE COURT:  You're aware that the Bar will provide

25  advisory type opinions if you have questions in your mind?

1          THE WITNESS:   Yes, I am aware.

2          THE COURT:   You have not taken advantage of that

3   service provided by the Florida Bar?

4          THE WITNESS:   I have not sought any sort of advisory

5   opinion from the Bar.

6          THE COURT:   Y'all may continue.

7          MR. DAVIDSON:   Your Honor, just brief redirect.   I

8   would like to make a comment, though.   Judge, in the context of

9   some of your questions --

10          THE COURT:   Mr. Davidson, I'm concerned --

11          MR. DAVIDSON:   Your Honor, I understand that.

12          THE COURT:   -- that an apparent filing in this court

13   was done for improper motive to achieve an extrajudicial

14   effect.   And I have not heard a good explanation of why six

15   pages were devoted to very graphic detail about the victims.

16          MR. DAVIDSON:   Well, Your Honor, I think Mr. Julin is

17   better equipped to argue that.   Your Honor questioned him on

18   it.

19          I actually was going to speak to what concerns me is

20   the fact that a decision was made -- and I made this --

21   Mr. Julin made this comment very briefly, to -- an affirmative

22   decision was made not to call Mr. Simpson -- who by the way is

23   Jimmy Judkins' partner -- Judkins & Simpson now -- not to call

24   Mr. Simpson to this hearing.   And I'm concerned that Your Honor

25   is making inquiry -- completely proper -- about what's

1    Mr. Simpson have to say about all this?

2             The ultimate purpose of filing this motion, whatever

3    parts were pressing or not pressing -- and I thought that was

4    made clear at the outset also -- the ultimate purpose is to

5    level the playing field so that it will be possible for the

6    criminal plea negotiations to get back on track.   And in our

7    judgment, right or wrong, putting Mr. Simpson on the stand and

8    having him examined in regard to all of the plea negotiations

9    with the state attorney's office, and all the other

10   communications with the state attorney's office, would not

11   advance that goal.

12            THE COURT:   Mr. Davidson, I'm concerned about Rule

13   11(b) which talks about representations to the court.   And it

14   said, "By presenting to the court, whether by signing, filing,

15   submitting or later advocating a pleading, written motion or

16   other paper, an attorney, or unrepresented party, is certifying

17   that to the best of that person's knowledge, information and

18   belief, formed after an inquiry reasonable under the

19   circumstances" -- and what I am hearing is causing me great

20   concern, particularly when I connect the dots with what I do

21   not see to be a justified effort in some six pages about the

22   victims.

23            MR. DAVIDSON:   Well, Your Honor, I completely respect

24   your concern as articulated up until you get to the six pages

25   and that's why I'm talking about Mr. Simpson.   And if we want

1    to get right to it, if Your Honor wants to pursue that inquiry,

2    respectfully, it has to be done at a later time.

3              THE COURT:  Well Mr. Julin, it's his motion, and he is

4    submitting it, under the requirements of Rule 11.  And I am

5    concerned why he devoted such effort to something that appears

6    to be irrelevant.  And I am concerned, from what I have heard

7    so far today, on what may not have been responsible inquiry

8    before filing that motion.

9              MR. DAVIDSON:  I understand that.

10             THE COURT:  Are we on the same wavelength?

11             MR. DAVIDSON:  Yes, sir.  Now, to close the door on

12   Your Honor's concern, there's -- the way to do it under the

13   judicial decisions in regard to a judicial expression of

14   concern for Rule 11 is for Your Honor to issue an order to show

15   cause specifying the concerns you have -- and I'm not

16   suggesting we don't understand them -- I'm just talking about

17   procedure -- and have a subsequent hearing, and you may rest

18   assured that the issue of Mr. Simpson's presence may be

19   substantially revised, because I understand Your Honor's

20   concern.  And I think you understand part of my job is to try

21   to protect the privilege, to some extent, to try to protect the

22   sanctity of the plea negotiations, but if Your Honor wants to

23   go farther in regard to what Mr. Simpson does or doesn't have

24   to say, then by gosh, he's going to be here.

25             THE COURT:  You know, I ordered this hearing as an

1    evidentiary hearing as quickly as we could because obviously, I

2    think in everybody's interest, we need to know what the facts

3    are.   And why you all made the decision not to bring Simpson --

4    and that was your decision.   Mr. Julin is laying a considerable

5    amount at Mr. Simpson's feet.   You'll just have to progress.

6    I'm here to hear the evidence to support that motion.

7          MR. DAVIDSON:   I understand, Your Honor.   But we're

8    really now talking about another motion or another order from

9    the court.   And my only point is that if Your Honor chooses to

10   proceed on your concerns, which is absolutely your -- in your

11   discretion, that that has to be done by the issuance of an

12   order to show cause and a subsequent hearing, or an

13   opportunity --

14         THE COURT:   We're here right now because you've asked

15   me to enforce a motion with sort of ultimate sanctions against

16   the plaintiffs' attorneys.   And that's what we're going to

17   accomplish today.

18         Now when all the evidence is in, and a fair

19   consideration, if I have concerns that Rule 11 sanctions should

20   apply, then certainly, that's for another day.

21         MR. DAVIDSON:   And I'm sorry, I misspoke.   I didn't

22   mean to suggest that we're entitled to a hearing.   We're only

23   entitled to respond.

24         All right.   Thank you, Judge.   And I appreciate the

25   opportunity to see where we're going here.

1     Just a couple of very brief questions, Mr. Julin.

2         REDIRECT EXAMINATION

3 BY MR. DAVIDSON:

4 Q. On this issue of Mr. Bellamy and the national publicity,

5 that you learned from Mr. Simpson that the state attorney had

6 told Mr. Simpson had been threatened, excuse me, by Mr. Dent,

7 did Bellamy play any part in that knowledge you gained in

8 regard to the national publicity?

9 A. No. As I say, Bellamy, his name just came up in the last

10 couple of days as someone that the state attorney had

11 identified as someone that was involved in this in some way,

12 and so I was -- having learned of this just recently, I was

13 interested to know what Mr. Bellamy's position was.

14 Q. But the original determination to put the allegations in

15 the motion had nothing to do with Mr. Bellamy. It was based on

16 what Mr. Simpson told you?

17 A. That is correct, yes.

18 Q. And the fact that Mr. Bellamy said he wasn't involved

19 didn't undercut the original determination in any manner

20 whatsoever?

21 A. No, it did not.

22 Q. Just one other question, Mr. Julin. In regard to your

23 notes, do you have a copy there?

24 A. I do not.

25     MR. DAVIDSON: May I hand a copy to the witness, Your

1    Honor?

2            THE COURT:   Yes.

3    BY MR. DAVIDSON:

4    Q.   You'll recall the questioning by Ms. Bevington in regard to

5    words used by Mr. Denton (sic) on the issue of the relationship

6    between resolution of the civil matter and the criminal

7    matters?

8    A.   Yes.

9    Q.   Both state and federal?

10   A.   Yes.

11   Q.   And you all talked about some words that were down at the

12   bottom of the second page of notes?

13   A.   Yes.

14   Q.   Is there a phrase in the second line of the second page of

15   notes that also references and refreshes your recollection as

16   to what Mr. Denton had to say?

17   A.   Yes, he said that we -- that he could maybe stave off a

18   federal indictment, and those -- the words that I took the

19   notes of said, "could maybe stave off a federal indictment."

20   And what he said beyond that was "through his clients'

21   cooperation with us in trying to resolve those criminal

22   matters."

23           MR. DAVIDSON:   Thank you, Mr. Julin.   We don't have

24   anything further, Judge.

25           THE COURT:   Mr. Julin, let me ask you about something

1    further about the intimidating effect that you attribute to

2    those subpoenas.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  What if McCloy had hand delivered a letter

5    to the state attorney and said, "This is to remind you, don't

6    destroy anything, and as soon as our stay is lifted, we're

7    going to send you a subpoena"?  Now would that have been

8    intimidating in your mind?

9              THE WITNESS:  I think that would have been

10   intimidating, and I think they could have done that and perhaps

11   achieved the same effect without --

12             THE COURT:  Would that have, in your mind, violated

13   the stay?

14             THE WITNESS:  That would not have violated the stay,

15   because they would not have issued the subpoena.  They would

16   not have used the power of the court, they would have just said

17   they were going to do that in the future.

18             THE COURT:  All right, let's take a ten-minute stretch

19   and we'll probably push on to about 12:30 before we break for

20   noon.

21       (Recess from 11:12 a.m. until 11:22 a.m.)

22             THE COURT:  All right, Mr. Julin, call your next

23   witness, please.

24             MR. JULIN:  Your Honor, we would rest at this point.

25             THE COURT:  All right, Ms. Bevington?

1          MS. BEVINGTON:  Your Honor, this kind of motion is

2     hardly appropriate for directed verdict, but I would ask

3     guidance from the court because I think on two of the rule

4     violations, there was no discussion, no argument, no

5     introduction of evidence, and, you know, we're prepared to put

6     on a defense, but I don't think they've carried their burden.

7          And one of them is the alleged forum shopping

8     allegation, and the other is the 1.7 conflict of interest,

9     which is the co -- the plaintiff, not the one having to do with

10    the successive government.  They've cited both of those rules

11    as part of their allegation that this is a pattern of ethical

12    violation.

13         THE COURT:  Ms. Bevington, I will withhold ruling on

14    your motion.  I understand what it is, but I want this to be a

15    complete record.

16         MS. BEVINGTON:  Okay, thank you, Your Honor.

17         I would call Franklin Harrison to the stand.

18    FRANKLIN HARRISON, PLAINTIFF WITNESS, AND OFFICER OF THE

19    COURT, TESTIFIED AS FOLLOWS:

20                      DIRECT EXAMINATION

21    BY MS. BEVINGTON:

22    Q.   Mr. Harrison, could you state your name for the record,

23    please?

24    A.   Franklin Harrison.

25    Q.   What is your profession?

1   A.   I'm an attorney.

2   Q.   Where do you practice?

3   A.   Panama City.

4   Q.   What is your relationship to Ross McCloy?

5   A.   He is a partner of mine.

6   Q.   I'm going to turn your attention to the civil forfeiture

7   action, which is related to the activities of the Girls Gone

8   Wild organization.   Are you familiar with that action?

9   A.   Yes, ma'am

10  Q.   Can you -- what was your role in the civil forfeiture

11  action?

12  A.   I was employed by the Bay County Sheriff's Office with a

13  written contract to represent them in pursuing the forfeiture

14  of an airplane and a Ferrari automobile.

15  Q.   And how did you come to be retained as the outside counsel

16  to the sheriff's office?

17  A.   I got a phone call from Sheriff Tunnell.   In fact, I was in

18  California and he called me and told me that he had seized

19  those two items of personal property and wanted to employ me to

20  represent him in a forfeiture proceeding.

21  Q.   Can you describe for the court the nature of discovery in a

22  civil forfeiture action, generally?

23  A.   Governed by the Rules of Civil Procedure, the Florida

24  Rules.

25  Q.   And who usually gets access to the documents or the

1    information that a lawyer, such as yourself representing the

2    sheriff's office, would use in a civil forfeiture action?

3    A.   I'm not sure I understand your question, Ms. Bevington.

4    Q.   The opposing party in a civil forfeiture action, would they

5    have any access to the documents that you reviewed?

6    A.   Oh, I'm sorry.   Certainly through the discovery process,

7    they would have access to the documents.

8    Q.   And did that discovery process occur in this particular

9    civil forfeiture action?

10   A.   There was discovery done in this forfeiture action, yes,

11   ma'am

12   Q.   And what documents or information were provided for review

13   as a result of that discovery in the civil forfeiture action?

14   A.   They took a subpoena -- I mean they took the deposition of

15   some of the investigators prior to us having the -- a court

16   hearing.   And in that they issued subpoenas for all of the

17   documents, all of the tapes, everything that were reviewed by

18   the investigator in drafting an affidavit that was attached to

19   our motion in the forfeiture action.

20   Q.   And did that subpoena cover each and every tape and

21   document that you had reviewed in connection with the civil

22   forfeiture action?

23   A.   Yes, it did.

24   Q.   Now, were any parts of -- can I call those the civil

25   forfeiture documents, for ease in reference?

1   A.   I know what you mean.

2   Q.   Were any part of the civil forfeiture documents disclosed

3   to anyone other than defense counsel in the civil forfeiture

4   action?

5   A.   No, ma'am

6   Q.   Were they not used at a court hearing?

7   A.   Oh yes, they were used -- a portion of them were used at a

8   court hearing before Judge Costello in a preliminary

9   adversarial hearing before Judge Costello, and they were also

10  reviewed by counsel for the -- for the -- not the defendants,

11  but the owners of the personal property.

12  Q.   And who was present at that hearing in front of Judge

13  Costello?

14  A.   I don't recall everyone that was present.  The --

15  Mr. Gretzky and Mr. Fensom were there representing -- one was

16  representing the owner of the airplane, the other representing

17  the owner of the Ferrari.  I was there, Kevin Obos in my office

18  was there, a representative of the sheriff's office, whom I

19  don't remember exactly who it was.  There were a whole host of

20  lawyers representing Mr. Francis, and I guess in the criminal

21  case, were there, including Mr. Dyer from Los Angeles.

22  Mr. McCloy was there, I believe, and there were media there.

23  There may have been other people.  It was in an open courtroom,

24  so I don't know.

25  Q.   Where did you obtain the civil forfeiture documents from?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I received them from Investigator Faith Bell.

2    Q.    And who does she work for?

3    A.    Bay County Sheriff's Office.

4    Q.    Where did the Bay County Sheriff's Office get the civil

5    forfeiture documents?

6    A.    Well --

7    Q.    Well, let me rephrase that for you.   What process did the

8    Bay County Sheriff's Office use to obtain the --

9    A.    Well, the physical evidence that -- you made it a little

10   bit broader term, but the physical evidence -- the videotapes,

11   the original videotapes and other matters were -- were gotten

12   by -- I believe there was a search warrant that was issued, and

13   they did a search, and that's where they confiscated all of

14   that.

15   Q.    Now, as to the civil forfeiture documents that you had

16   access to, do you have an understanding whether the public

17   generally would have access to those documents?

18   A.    The public would have access to -- in general, the public

19   would have access to any of those documents, as I understand

20   it, once the defendants in the criminal case request or agreed

21   to participate in discovery in the criminal case, which was

22   done, I think, on the same day we filed the forfeiture.

23        But, because some of the items were contraband, in the

24   opinion of the state attorney's office, involving children

25   performing sexual acts or pornography, they were not generally

1   open to the public to walk down there and look at them

2   Q.   Let me just clarify something.   You may have misunderstood

3   my question.   I think your answer was directed to all of the

4   things that were seized by the sheriff's office.

5   A.   It was.

6   Q.   Would that be correct?

7   A.   That's correct.

8   Q.   And with that clarification, and with the court's

9   indulgence, I'll leave that answer on the record.

10       What was Ross McCloy's role in the civil forfeiture

11   proceeding?

12   A.   He's had a whole lot more trial experience than I have, and

13   that's more what he does than what I do.   And I consulted with

14   him, mostly on strategy, to determine what evidence to present

15   at our forfeiture hearing.   The -- these tapes were --

16           THE COURT:   Ms. Bevington, just a moment.   We're

17   afraid we've lost Mr. Dent.

18       (Pause)

19           MR. DENT:   Hello?

20           DEPUTY CLERK:   Can you hear us?

21           MR. DENT:   Yes, I can hear.

22           THE WITNESS:   The -- some of these -- most of these

23   tapes were very graphic, and I was having some -- I had to go

24   through a decision making process about how much I wanted to

25   show to the judge and how much was too much, and I relied on

PDF created with pdfFactory trial version www.pdffactory.com

1    Ross for his experience in that area.

2    BY MS. BEVINGTON:

3    Q.   And when he was assisting you with those decisions, what

4    universe of documents did he have access to?

5    A.   Well, the original tapes that were seized were on some type

6    of media that I'm not familiar with.   It's not the VHS tapes.

7    They have some special stuff, as I understand it, so they can

8    immediately transmit the pictures to California.

9         And I talked with Faith Bell and told her the type of

10   evidence that I would need for a forfeiture hearing, that would

11   tie the Ferrari and the airplane to the commission of -- aiding

12   in the commission of a felony, or as an instrumentality in the

13   commission of a felony.   And I told her I needed tapes

14   involving the Ferrari, involving the Gulfstream airplane, and

15   felonies being committed, you know, tying those together.

16        And as a result, she brought me, as I recall, a brown paper

17   bag full of videotapes, which were VHS tapes that I'm familiar

18   with, that she had made for me to review to determine what to

19   use in the forfeiture proceeding.

20        Mr. McCloy -- I had those in my office.   Mr. McCloy would

21   have had access to all of those tapes.   I'm not sure that he

22   ever looked at -- I'm sure he looked at some, because we had a

23   talk about them, but he would have had access to those.

24   Q.   And these tapes that you were describing in this brown

25   paper bag are what we have previously referred to as the civil

1   forfeiture documents?

2   A.   (Nods affirmatively.)

3   Q.   Did you -- what help did you provide to Mr. McCloy to

4   obtain access to documents in the possession of the sheriff's

5   office other than the civil forfeiture documents?

6   A.   None, none whatsoever.

7   Q.   Turning your attention, Mr. Harrison, to the case in which

8   we are appearing here today, the John Doe vs. Francis case, can

9   you describe your firm's role in this case?

10  A.   We represent the plaintiffs in the case, along with

11  Mr. Dent.

12  Q.   Are you familiar with the Rule of Professional Conduct

13  4-1.11?

14  A.   Yes, ma'am

15  Q.   What application does that rule have to your firm's ability

16  to represent the plaintiffs in this action at the same time as

17  you represent the sheriff in the forfeiture action?

18  A.   I don't see that it has any application.

19  Q.   And can you explain why you take that position?

20  A.   Well, first of all, we're not government lawyers.   I mean,

21  I'm not an employee of the sheriff's office.   Secondly, as I

22  understand the rule, it's for the -- it's applicable when you

23  leave government and then go out and represent people and --

24  for or against them-- using the information you gained as a

25  member of the government.   And that was not the case here.

1    We were representing two different civil clients in this

2    action, and there was -- well, there certainly was no

3    confidential information.  All of the information that

4    Mr. McCloy saw, the defense lawyers were given the opportunity,

5    and did, as I understand it, review all of those tapes

6    themselves prior to a hearing, with the exception of one,

7    which, since I've said that I need to -- there was one tape

8    that they did not review because I did not have it until right

9    before the hearing, and it was not really the subject of their

10    subpoena, but we used it in the criminal proceeding with the

11    understanding -- actually, I think I just told the court what

12    was on it and made a representation.

13    The defense lawyers wanted the opportunity to review it

14    because that was the only one they had not seen, and if they

15    objected to my representation, they would have told the court.

16    They reviewed it and had no objection.  At some point in the

17    hearing it got to be a little too much, and we just started

18    making representations about what was in the tape rather than

19    viewing it.  And Judge Costello had all she wanted to watch.

20    Q.   On the topic of the confidential information, had this

21    information, the civil forfeiture case and documents, not

22    contained child pornography, would they have been freely

23    available to the public?

24    A.   Yes, ma'am

25    Q.   Are you familiar with Ethical Rule 4.1.7 which deals with

1   conflicts of interest between two simultaneous --

2   A.   Yes, ma'am

3   Q.   Did you consider any potential application of that rule to

4   the simultaneous representation of the sheriff's office and the

5   plaintiffs in this action?

6   A.   Yes, ma'am

7   Q.   And what did you do about that?

8   A.   Well, when initially Ross was contacted, I think by

9   Mr. Dent -- he would have to say, I don't remember -- about

10  representing some of the victims, he and I discussed it.  And I

11  -- he called and talked to the Bar.  I mean we have kind of a

12  standard rule in our office, if we see a -- if you're not sure,

13  we're going to call and make sure, and he called and talked to

14  them to make sure that there was not any ethical conflict

15  there.

16       In addition, I talked with the sheriff, and made him aware

17  that we had been called, and explained to him that there could

18  be a conflict, but I did not think that it would interfere with

19  our -- my representation of his interests, the sheriff's

20  office' interest in the matter, and he fully understood that

21  and said he had no problem with it.  And I did not get that in

22  writing.  It was conversation.

23            MS. BEVINGTON:  I don't have any further questions,

24  Your Honor.

25            THE COURT:  Mr. Davidson?

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. DAVIDSON:   Just one question.

2                    CROSS-EXAMINATION

3     BY MR. DAVIDSON:

4     Q.   Mr. Harrison, I think this is clear on the record, but

5     without question, a portion of the investigative file in the

6     civil forfeiture action was not available to the public,

7     correct?  For whatever --

8     A.   Ask me that one more time.  I want to be sure I understand

9     your question.  I'm sorry, sir.

10    Q.   You earlier testified to this on direct, and I just want to

11    make it absolutely clear that some of the material in the

12    investigative file in the forfeiture was not available to the

13    public because of the nature of the material?

14    A.   Because it involved children and it was determined to be

15    pornography.  It was available to the defense counsel, they saw

16    it all.

17    Q.   Understand.

18    A.   But not to the --

19    Q.   But not to the public?

20    A.   That is correct.

21          MR. DAVIDSON:   Thank you, sir.

22          THE COURT:   Anything further?

23          MS. BEVINGTON:   I don't have anything further.

24          THE COURT:   You may step down.  Call your next

25    witness, please.

1          MS. BEVINGTON:   Your Honor, I would call Thomas Dent,

2    who is on the phone.

3          Mr. Dent, you can you hear me all right?

4          THE WITNESS:   Yes, I can.

5      THOMAS DENT, PLAINTIFF WITNESS, AND OFFICER OF THE COURT,

6    TESTIFIED, VIA TELEPHONE, AS FOLLOWS:

7                        DIRECT EXAMINATION

8    BY MS. BEVINGTON:

9    Q.   Mr. Dent, can you state your name for the record, please?

10   A.   Thomas Dent.

11   Q.   And what is your profession, Mr. Dent?

12   A.   I'm an attorney.

13   Q.   Where do you practice?

14   A.   My office is in Chicago.

15   Q.   How long have you been engaged in the practice of law?

16   A.   Thirty-five years.

17   Q.   Can you describe for the court all of the allegations of

18   unethical behavior that have been levied against you in these

19   35 years?

20   A.   None.

21   Q.   How do you come to know Ross McCloy?

22   A.   About five or six years ago, I was retained by a company in

23   Panama City to conduct some civil litigation, some

24   investigative work, and I met Ross, and ultimately Ross and I

25   worked together on that case.

1   Q.   What is your role in the matter on which we are here today,

2   to the John Doe v. Francis case?

3   A.   I'm one of the attorneys that represents the plaintiffs in

4   that case.

5   Q.   How did you come to represent the plaintiffs?

6   A.   In the course of my representation of the corporation in

7   Panama City, I came to know some of the employees of that

8   corporation.   When one of the employees' daughters was

9   victimized by the Girls Gone Wild crew, he came to me.   He was

10   familiar with my work for the company and Ross's work for the

11   company, and he came and inquired as to whether we would

12   represent him in matters related to his daughter's

13   difficulties.

14   Q.   Okay.   And how many plaintiffs do you currently represent

15   in this action?

16   A.   Seven.

17   Q.   And how did the other six come to you?

18   A.   I'm not sure exactly how, but I know this employee of the

19   corporation gave my name and number, and Ross's name and number

20   to several others, and the others have called me.   I don't know

21   how they got my number.   I think the case at some point became

22   pretty well known.

23   Q.   Which of these clients did you yourself call or solicit?

24   A.   I did not make the initial contact with any of them

25   Q.   Can you tell the court what information Ross McCloy or

1   anyone from his firm provided to you about the identity of any

2   of the minor victims in the underlying matter?

3   A.   None.

4   Q.   What is Ross McCloy's role in this case?

5   A.   He is co-counsel, local counsel.

6   Q.   And how did that come about?

7   A.   It came about initially that this employee of the

8   corporation knew both Ross and I.  We had been doing work

9   together as a team for the corporation for several years at

10  that point.  And we continued to work as a team in this case.

11  Q.   Who is Franklin Harrison?

12  A.   He is a partner of Ross McCloy's.

13  Q.   What do you know about Franklin Harrison's involvement in

14  any matter related to Girls Gone Wild?

15  A.   I know that he represents the Bay County Sheriff's Office

16  in its civil forfeiture case.

17  Q.   Can you tell us when you became aware of that?

18  A.   Not exactly, but about the time that he was retained, I

19  think.

20  Q.   Did you see any problems or conflicts regarding your

21  representation of the minor victims that you represent and

22  Mr. Harrison's role with the sheriff?

23  A.   Well, we were sensitive to a couple potential conflicts;

24  one being that we were going after the assets of the same

25  gentleman who owned the car and the airplane, or the same

1   corporations or gentlemen that did.  And secondly, that

2   Mr. Harrison would have access to the sheriff's file and

3   possibly some confidential information in that file.

4   Q.   With respect to this -- the asset question that you've

5   testified about, how did you -- what was your analysis about

6   that potential conflict?

7   A.   Well, I didn't feel that the assets that the Bay County

8   Sheriff was going after were material.  They were a very small

9   subset of assets of the larger assets of the corporations and

10  Joe Francis.  Those are reputedly to be in the hundreds of

11  millions of dollars, according to press statements and some

12  information.  Though I did not think that Franklin was going

13  after the automobile and the airplane, even if he was

14  successful, would diminish our ability to collect should we get

15  a judgment in this case.

16  Q.   Did you have any discussions at all with your clients, the

17  seven victims with respect to that?

18  A.   We alerted all of them, at the time, that Ross's partner

19  did represent the sheriff and was going after some of these

20  assets, and we received waivers from all of them  They still

21  wanted Ross to continue in his representation.

22  Q.   Now, turning your attention to the information, tapes and

23  other information that the Bay County Sheriff's Office had,

24  what access have you had to the items seized by the sheriffs in

25  connection with the Girls Gone Wild organization?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   I was shown portions of, I think it was three videotapes,

2   at the Bay County Sheriff's Office.  They selected the tapes

3   and the portions that I was to see, and what I saw were the

4   images of my clients only.  I didn't get copies of those tapes

5   or anything.  We just went over and they sat -- the sheriff's

6   employee sat me down and showed me those videos and I left.

7   Q.   Who arranged for you to have that access?

8   A.   I don't recall who at the sheriff's office, but someone at

9   the sheriff's office.

10  Q.   Who made the call to the sheriff's office?

11  A.   I don't recall.  I think I did, because I wanted to see

12  what they had, and I wanted to see the tapes.  My clients had

13  told me that they had been photographed and taped, and I wanted

14  to know if those tapes had been part of the material

15  confiscated, and if so, I wanted to see what -- whether those

16  tapes did in fact contain the images of my clients.

17  Q.   What role did Franklin Harrison have in arranging for that

18  access?

19  A.   None.

20  Q.   What is your understanding about the access that would have

21  been provided to those same tapes to Mr. Julin?

22  A.   Well, I understood that he would have equal access to them

23  I know other attorneys representing the same defendants did, in

24  fact, view these tapes, and I think they even have copies of

25  them

1    Q.   I want to turn your attention to the motion to stay these

2    civil proceedings pending the resolution of the criminal

3    matter, and specifically to the February 4, 2004 hearing on

4    that motion.   Were you present at that hearing?

5    A.   Yes, I was.

6    Q.   Was the motion to stay granted?

7    A.   Yes, it was.

8    Q.   Were you in agreement with the granting of the motion -- of

9    the stay?

10   A.   Yes, I was.

11   Q.   What were the terms of the stay?

12   A.   The stay was to continue until the criminal case was

13   resolved.   The defendants were to give periodic statuses in

14   that regard because we expressed some concern that the criminal

15   case might go on for an extended period of time.

16       We also -- I think I specifically expressed a concern that

17   if the criminal case ended, some of the materials or some of

18   the evidence that had been brought in through the search

19   warrants or otherwise, to the sheriff's office, the state's

20   attorney's office, might be destroyed or returned.   So we

21   carved out an exception to the stay, and that was to file a

22   preservation subpoena that simply would ensure that the

23   materials would not be destroyed or returned at the conclusion

24   of the criminal case before we had an opportunity to get them

25   Q.   Did the defendants pose any objection to that carve-out?

1    A.   Not that I recall.

2    Q.   Did the judge make any mention of when the subpoena should

3    be issued?

4    A.   Well, yeah, the judge urged us, in order to maximize the

5    protection, to do it quickly, to do it in a timely manner.   The

6    sooner we did it, the sooner that ongoing protection would

7    attach.   So I guess she, too, shared my concern that some of

8    the materials might be destroyed or otherwise unavailable to

9    us.

10   Q.   Did you have -- did you gain -- did you have any

11   understanding that the judge's comments with respect to the

12   timeliness of the subpoena were designed to create a window of

13   opportunity that would close?

14   A.   No, the subpoena was -- didn't have any expiration date on

15   it.   The subpoena was to be effective at the time of the

16   conclusion of the criminal case, which was at that time and

17   even now, is unknown.   It's sometime in the future.   So it was

18   an open ended authorization to file a subpoena and to have that

19   subpoena secure the materials.

20   Q.   Let me be a little more precise about my question.   What

21   was your understanding, again, of the reason why the judge

22   urged a prompt issuance of the subpoena?

23   A.   I think my understanding of why she did that was to

24   maximize the protection of the subpoena rather than waiting at

25   some point -- that something might have happened that would

1    have made it too late to file the subpoena or make the subpoena

2    less effective.   So she suggested that we file it promptly so

3    that that ongoing protection that was afforded by the subpoena

4    would attach to those materials right away.

5    Q.    And yet it was two years later that the protective

6    subpoenas were actually filed.   Can you explain to the court

7    why that delay?

8    A.    It was merely an oversight.

9    Q.    What reminded you of the fact that there had been this

10   oversight?

11   A.    We were made aware that the criminal case was -- at one

12   time there was a plea agreement that was proposed to resolve

13   the criminal case, and we were given no notice of that

14   directly, and felt that if that were the case, if the criminal

15   case were to be ended abruptly, that we needed to have that

16   protection, and I think we had a conversation about that

17   subpoena and we realized together it had not been sent.

18   Q.    What was your intent in issuing the subpoena at that time?

19   A.    The subpoena was to accomplish what the judge had said it

20   should accomplish, and that is to ensure that the materials,

21   the evidence in the hands of the prosecutors, would not be lost

22   at the conclusion of the criminal case, not be lost to us.

23   Q.    Did you have any other intent?

24   A.    No.

25   Q.    I'm going to turn your attention to the Rule of

1    Professional Conduct 4-3.4(g), and I would read into the

2    record, Mr. Dent, since you are not here for me to show you my

3    little cheat sheet, that the language of that rule states, "A

4    lawyer shall not present, participate in presenting, or

5    threaten to present, criminal charges solely to obtain an

6    advantage in a civil action."

7         Can you describe to the court all of your conduct in

8    violation of that rule?

9    A.   I have never done any of those things.

10   Q.   I want to turn your attention to a conversation between you

11   and Tom Julin, the first of two conversations which took place

12   on March 21, 2006.   Do you recall that conversation?

13   A.   Yes, I do.

14   Q.   Who initiated the call?

15   A.   I initiated the first call.   He initiated the second.

16   Q.   Let's talk about the first call on March 21st.   Who did you

17   say initiated that one?

18   A.   The first one?

19   Q.   Yes.

20   A.   Julin did.

21   Q.   The first call, Mr. Julin did?

22   A.   I did, I'm sorry.   I initiated the first.   He initiated the

23   second.

24   Q.   What was your purpose in initiating that first call?

25   A.   I had had a discussion with Ross and understood that we

PDF created with pdfFactory trial version www.pdffactory.com

1   would have to -- local rule would require that we go through a

2   mediation first before we could proceed to the conclusion of

3   the civil case.   I also understood that Julin had raised

4   settlement -- the possibility of settlement back in October,

5   and again mentioned it in January when Ross discussed with him

6   our motion status conference before Judge Smoak.

7        So the purpose of my call was to follow up on his

8   settlement overtures and to try to establish settlement

9   discussions, if they were to occur, in a mediation format, so

10  we could eliminate that requirement.

11  Q.   In his affidavit, Mr. Julin has a statement that he

12  encloses in quotation marks that he attributes to you, which

13  states that if the civil case were settled -- and I open quotes

14  -- "we could kill two birds with one stone," close quotes.   Do

15  you recall making that statement?

16  A.   I don't recall making that statement, no.

17  Q.   You just testified that you were calling Mr. Julin in order

18  to discuss the settlement of the case?

19  A.   No, I was calling him in order to set up a procedure to

20  discuss settlement.   The call was not to discuss settlement.   I

21  had no settlement authority or no number or anything.   It was

22  to see if he wanted to discuss settlement at some future date,

23  and to try to set a date and a format for those discussions.

24  Q.   And you had also stated, I think, that you understood that

25  there was a requirement that there be mediation?

1  A.   Right.  So I wanted to be sure that we didn't just sit down

2  and chit chat about it; that we followed appropriate mediation

3  so that if and when the criminal case was resolved -- I mean

4  when it was resolved -- we could proceed with our case without

5  having to go through a mediation at that time.  For three

6  years, I was anxious to get things going.

7  Q.   He -- Mr. Julin attributes to you a statement that he

8  doesn't enclose in quotations, but he paraphrases, to the

9  following effect:  That when you were prosecuting cases, one of

10  the factors in deciding what to do in considering whether to

11  prosecute a case was to consider what was happening with civil

12  claims of the victims.  Do you recall making a statement of

13  that sort?

14  A.   I don't remember the exact words.  I definitely reiterated

15  what I think is widely known and that is that restitution,

16  settlement with civil victims of a crime, is something that is,

17  I think, universal -- I don't know -- but very often considered

18  by judges and prosecutors in related criminal actions.

19  Q.   You're a former prosecutor?

20  A.   Yes, a U.S. Attorney in Chicago.

21  Q.   And what was your view of restitution when you were a

22  prosecutor with respect to considering pleas in criminal cases?

23  A.   I would find -- if a defendant made restitution in the form

24  of settlement of civil cases, that would inure to his benefit

25  in my consideration of plea bargains or sentence

1    recommendations, that sort of thing.  It's a positive thing for

2    a defendant to make restitution.

3    Q.   Now, Mr. Julin does not include this in his affidavit that

4    he filed with the court, but he has testified today that in

5    this first call, on March 21st, that you mentioned to him that

6    there was a federal criminal case that was -- appeared to be

7    maturing towards an indictment.  Do you recall having

8    discussions about that case?

9    A.   I remember us discussing the federal investigation that he

10   was fully aware of.  I did not say it was maturing towards

11   indictment because I don't know that.  I know that a federal

12   investigation had been going on since 2004.

13        Mr. Julin also knows that because in his motion, at pages

14   15 through 18, he makes reference to the depositions of several

15   of the girls, and in those depositions, which he refers to in

16   his motion, those girls talk about being interviewed by the FBI

17   in 2004 and 2005.

18        So obviously Mr. Julin had access to all of those

19   depositions because he included them in his motion.  It was on

20   his desk the day I called him  And in those depositions it

21   clearly states that they had been interviewed by the FBI more

22   than a year earlier.  So he knew about the federal

23   investigation and he knew how long it had been pending.

24   Q.   Let me turn your attention to the next day.  There was

25   another conversation with Mr. Julin?

1    A.   Yes.

2    Q.   Who initiated that call?

3    A.   Mr. Julin did.

4    Q.   And what was the purpose of his call?

5    A.   I now think I understand the purpose of it.   But what he

6    stated the purpose of it was he called to try to find out -- he

7    wanted a specific settlement demand figure.   Again, he had

8    sought that earlier.   I again refused and said, "I'm not

9    prepared to talk settlement.   These aren't settlement

10   negotiations.   What I want to discuss with you is whether you

11   are willing to discuss settlement, and if so, if you're willing

12   to do it in a mediation format soon, in April."   This would

13   have been in March.   And I told him I did not have any

14   authority to make any demands, that we were not talking about

15   settlement, we're talking about the scheduling of discussions.

16   Q.   Mr. Julin attributes to you a -- what he characterizes as a

17   quote, enclosing in quotation marks, to the effect that you

18   said that maybe Joe Francis, open quotes, "could maybe stave

19   off," close quotes, the criminal issues, which he has today

20   clarified that could stave off a federal indictment, is

21   precisely what you had said.   Do you recall saying that?

22   A.   No.   And I would point out that the federal -- the FBI and

23   Department of Justice have been looking at this case for over a

24   year.   They clearly have access to the state criminal

25   information, to the -- our case.   They have a lot of

1    information before them, which they will consider in whether to

2    indict or not.

3         There's nothing I could do to materially influence that.

4    And I never suggested in anyway that I could or would do

5    anything.

6         Again, the only discussion we had in that regard was the

7    general discussion that settlement and restitution to victims

8    is something that prosecutors and judges merely consider in

9    making decisions regarding prosecution, sentencing and plea

10   bargaining.

11   Q.   Okay, a further comment that he attributes to you, again in

12   quotes, is that -- that you said that you thought that Joe

13   Francis, open quotes, "would want to get some positive input,"

14   close quotes.

15   A.   I don't recall that, but that is a true statement.   I

16   imagine he would want to get some positive input, and the

17   positive input that he stood to get was the fact that our --

18   that the civil case settled and that restitution was made.

19   That's not something I said I would do, or my clients would do.

20   That's simply a fact that he might use to his benefit.

21   Q.   Were there any statements that you can recall in either of

22   those conversations that could fairly be interpreted to suggest

23   that you had -- you were making a threat to participate in

24   presenting these federal criminal charges?

25   A.   Absolutely not.   The federal charges, whatever they may be,

PDF created with pdfFactory trial version www.pdffactory.com

1   have been under scrutiny by the FBI and Department of Justice

2   for over a year.   There's nothing that I could have or

3   threatened to present.

4   Q.   When was the motion for order to show cause and for

5   disqualification filed?  Do you recall the date?

6   A.   Yes, it was filed on the 23rd, I think.

7   Q.   And that was the day after the call that Mr. Julin

8   initiated?

9   A.   Yes, it was.   And I think he said that motion was sitting

10  on his desk when he initiated the call.

11  Q.   Right.   And did he mention anything about that motion to

12  you?

13  A.   No, not at all.

14  Q.   Okay.   Did you ever come into any knowledge with respect to

15  a proposed plea agreement between the criminal defendants in

16  the state action and the Bay County State Attorney?

17  A.   Yes, I did.

18  Q.   When did you hear about that?

19  A.   I was on vacation in Key West and I got a call from some

20  parents of clients --

21  Q.   Let me interrupt you just a minute.

22         MS. BEVINGTON:   Your Honor, I would like to make a

23  motion that, to the extent that Mr. Dent needs to discuss

24  communications with his clients, that it would not constitute a

25  waiver beyond those conversations.

1      You know, I have no problem with their being

2  cross-examination as to those specific conversations, but I

3  would hate for this to be a broader waiver of all

4  attorney/client communications.

5      We are here, you know, defending allegations and not

6  the ones that are creating the situation where the -- where the

7  waiver may become a reality.

8      THE COURT:  Mr. Davidson?

9      MR. DAVIDSON:  Your Honor has already recognized a

10  partial waiver, and we have no objection.

11      THE COURT:  All right, for that limited purpose.

12  BY MS. BEVINGTON:

13  Q.  Please proceed, Mr. Dent.  I apologize for the

14  interruption.

15  A.  Okay, on Thursday, the 26th of January of this year, I got

16  calls from the parents of three of the girls, who told me that

17  they, the night before, had had meetings with two state's

18  attorney representatives in the home of one of the parents, and

19  that at that time the representatives of the state's attorney's

20  office had informed them for the first time that there was a

21  plea bargain that was imminent, and they told them some of the

22  terms of the plea bargain, including the fact that it was to be

23  announced that Friday, two days hence, or the day after they

24  called me.

25  Q.  What was their reaction to the information that was

1  disclosed to them about the state attorney?

2  A.   They were extremely upset about it, very agitated, and

3  expressed to me their frustration with this, and said that they

4  had opposed the proposed plea agreement at the time they spoke

5  with the state's attorney representatives.

6  Q.   Did you talk to the state attorney yourself?

7  A.   I talked to both -- the same state's attorneys that day,

8  Thursday, the 26th.

9  Q.   And who initiated that contact?

10  A.   I did.

11  Q.   And again, who did you speak to?

12  A.   I spoke to Mark Graham and Larry Bassford.   They were on

13  speaker phone.

14  Q.   What was the purpose of that call?

15  A.   I called because my -- the clients, when they talked to me,

16  they were very upset but they did not know the details of the

17  plea agreement.   The one that upset the most was that Joe

18  Francis was to plead only to a misdemeanor, and that the other

19  43 odd charges against him, most of which were felony charges,

20  would be dropped.   And I -- and also that there was going to be

21  some kind of an announcement in a day or two.

22      I called the state's attorneys to find out what the details

23  of this was, who the plea agreement covered, who it didn't

24  cover, if anyone, what announcement was going to be made, all

25  that sort of thing, just to get more information about what was

PDF created with pdfFactory trial version www.pdffactory.com

1   proposed.   The families also told me they felt it was a, quote,

2   "done deal," that the -- you know, that they had no input.

3   Q.   Please describe any comments that you made in that

4   conversation, or any conversation, before the end of that week,

5   which might have been construed as a threat of using the media,

6   or a national media campaign, against the state attorney?

7   A.   I never threatened that I would conduct any media campaign.

8   I've never spoken with or retained any media consultant in that

9   regard.   My conversations with them reiterated what the clients

10  had told me, and that was that they were very upset with the

11  proposed plea agreement.

12  Q.   Are you familiar with Local Rule 77.3?

13  A.   Yes.

14  Q.   Can you describe for the court all public extrajudicial

15  releases of information regarding the criminal and the civil

16  matters in which you have participated?

17  A.   The only time I ever spoke to the press on this was back

18  in, I think it was 2004, when I was sitting in my office and

19  got a call, phone call from a reporter for the New York Times

20  who wanted me to comment on the case.   I told them I would not.

21  I think they asked -- and again this is just from memory --

22  what is the purpose of the case, or something.   I made the

23  comment that the case is to try to stop the defendants from

24  using minors in the production of their videotapes.   Other than

25  that, no other statements I've made, extrajudicial statements,

1    to anyone.

2    Q.   Can you describe for the court any statement that you might

3    have made that could possibly have been construed as a threat

4    to make such public extrajudicial releases of information?

5    A.   No, I did not make threats to release anything.

6    Q.   Thank you, Mr. Dent.   That's all I have for the moment.

7                          CROSS-EXAMINATION

8              MR. DAVIDSON:   Is the microphone with this -- he's

9    going to hear me through the microphone?

10                         CROSS-EXAMINATION

11   BY MR. DAVIDSON:

12   Q.   Good afternoon -- good afternoon, Mr. Dent.   This is Barry

13   Davidson.   I'm Mr. Julin's partner.

14   A.   Good afternoon.

15   Q.   I have a few questions for you on cross-examination.   You

16   can hear me fine, I assume?

17   A.   Yes, I can.

18   Q.   All right.   You were a former federal prosecutor, correct?

19   A.   Yes.

20   Q.   Have you had any contact with the federal prosecutors that

21   you've told us are looking into the conduct of my client in

22   regard to the situation here in Panama City?

23   A.   Yes.

24   Q.   Please tell us about that contact.

25   A.   They have called to set up interviews with themselves, the

1    FBI and three of the girls that are the subject of the state

2    criminal prosecution, and those girls have in fact submitted to

3    FBI interviews.

4    Q.   In your discussion with federal prosecutors, did you -- did

5    they ask you, and did you tell them, your view of the

6    substantive aspects of the case?

7    A.   No.   We've had discussions only about setting up the

8    interviews, and they gained whatever information they have

9    directly from the victims.

10   Q.   They didn't ask you at all, Mr. Dent, as a former federal

11   prosecutor what your views were?

12   A.   I don't recall any conversations like that.

13   Q.   All right.   Now you made a comment that you believed that

14   Mr. Julin knew -- we're talking about the first conversation

15   that Ms. Bevington asked you about -- and we agreed that in

16   that conversation -- and this is the call you initiated -- we

17   agreed that you mentioned that there was a federal criminal

18   case that is pending or about to be brought, correct?

19   A.   No, I don't know what is about to be brought or not.   I'm

20   saying there is a -- there is an ongoing federal investigation

21   that both the defendants and I have known about, that's been

22   going on at least since 2004.

23   Q.   Okay.   Criminal case investigation, either one, I

24   appreciate the distinction, because I think you said you did

25   not reference an indictment or the fact that an indictment

1  might be imminent.

2  A.   I don't know if an indictment is imminent or not.

3  Q.   And you don't remember whether you discussed it with

4  Mr. Julin?

5  A.   I did not discuss an indictment with Mr. Julin.   I

6  discussed an ongoing federal investigation that I believed

7  fully that he knew, since all of the girls -- or three of the

8  girls anyway -- had testified to either in both their civil

9  forfeiture depositions and criminal depositions, or one of the

10  other of those.   So it was not secret that these girls were

11  being interviewed by the FBI and the Department of Justice.

12  Q.   And your belief that Mr. Julin knew about the federal

13  investigation -- I think you reference pages 15 to 18 of the

14  motion for order to show cause.

15  A.   That's correct.

16  Q.   Okay.

17  A.   They referenced those very depositions in his motion in

18  which those girls testified that they had been interviewed by

19  the FBI.

20  Q.   Well, we'll let pages 15 to 18 speak for themselves.

21       Now, Ms. Bevington also asked you whether you used the

22  term, in the first conversation, "two birds -- "kill two birds

23  with one stone."   You say you didn't recall?

24  A.   I don't recall that no.

25  Q.   Does that mean you don't recall either way, or you have

1    specific knowledge that you didn't say it?

2    A.   I don't recall.

3    Q.   Just don't recall.  You also referenced contact with the

4    state attorney's office precipitated by your clients and your

5    clients' parents.  How many conversations did you have with

6    Mr. Graham and/or Mr. Bassford?

7    A.   About this time I think I had one.

8    Q.   Have you had any subsequently?

9    A.   Not that I recall.

10   Q.   Did you have any prior?

11   A.   Yes, I've had conversations with them over the years.

12   Q.   And what has been the general nature of the conversations?

13   A.   General nature of the conversation is my asking them about

14   the progress of the criminal case because the progress of my

15   case is tied directly to that.  It is in my interest that the

16   criminal case be resolved because I think it's been going on

17   for three years.  I'm very anxious to get our case moving.

18   Q.   Now, going back to the discussion you had with them after

19   the contact from your clients and their parents, Ms. Bevington

20   asked you if you ever threatened anything in the nature of a

21   media campaign, correct?

22   A.   Yes, she asked me that.

23   Q.   And you said you did not.

24   A.   No, I have never threatened to conduct a media campaign.

25   Q.   Let's take the words "threaten" and "media" -- excuse me,

PDF created with pdfFactory trial version www.pdffactory.com

1    let's take the words "threaten" and "campaign" out of the

2    question.   Did you discuss possible media attention to the

3    state attorney or the sheriff's office if a plea of this nature

4    was accepted?

5    A.   I don't recall exactly if that was discussed.   It was that

6    in the -- at the kitchen table of parents of one of my clients,

7    the day before, Wednesday, when the parents of three of the

8    victims met with Mark Graham and Larry Bassford, they told me

9    that when the representatives of the state's attorney's office

10   said they were going to announce this plea agreement, that two

11   of the mothers there said, "Well, if that's going to be

12   announced, then it's going to be widely reported, and we want

13   to be sure that they understand that we're against it."   And I

14   wasn't at that table, but from what I understand from them is

15   that they mentioned Oprah and Dr. Phil and other national media

16   sources.   That was something that was said at the -- the day

17   before I even learned of the plea bargain that was being

18   proposed.

19   Q.   And to your knowledge, that was communication from the

20   victims' parents to the state attorney's office?

21   A.   Yes, that's what I understood.   There was a -- again, a

22   discussion about the parents wanting to make sure that the

23   media understood that they were against the plea bargain.

24   Q.   And surely, Mr. Denton, when you talked to Mr. Graham and

25   Mr. Bassford the next day, this subject came up?

1  A.  I don't recall that it did or not.  It could well have come

2  up.  It wasn't -- I have instructed these families not to go to

3  the media several times before, and I did when they mentioned

4  this to me that Thursday.

5  Q.  Let's go to the second conversation, the next day after you

6  called -- oh, by the way, you called Mr. Julin on March 21st,

7  and I think you characterized it as a continuation of

8  settlement discussions?

9  A.  I said that I understood that the original overture for

10  settlement came from him in the fall, and I had talked recently

11  to Ross, and he believed that Julin had mentioned again

12  settlement at the time that Ross called him to notify him that

13  we were filing a motion for status before Judge Smoak.

14  Q.  So in your view, a gap of November, December, January,

15  February, almost all of March, is merely a continuation of

16  discussions?

17  A.  No, I don't -- when I called him, I called him for the

18  reasons I just said.

19  Q.  I was only asking you about the use of your word

20  "continuation" in your direct testimony, Mr. Denton.

21  A.  I also understood that we had a requirement to go through

22  mediation before our case could -- would be completed and

23  pursued.  So I wanted to get that out of the way.

24  Q.  Correct.  Now, let's go back to the second conversation.

25  You don't recall using -- referencing a federal indictment?

1    A.   That's correct.

2    Q.   And you don't recall talking about the maturity of the

3    federal investigation?

4    A.   I don't recall that.   We knew that there had been a federal

5    investigation underway involving many of the victims for over a

6    year.   That is a fairly mature investigation.

7    Q.   And in regard to your lack of recollection, same question

8    as before, you don't recall either way, do you?   You can't deny

9    you said it?

10   A.   Said what?

11   Q.   That you referenced a federal criminal case and that you --

12   excuse me, I apologize -- that you referenced a federal

13   indictment, and that you referenced the maturity of the federal

14   case?

15   A.   My best recollection of that is that I referenced the

16   ongoing federal investigation -- not case or indictment -- but

17   the investigation.

18         MR. DAVIDSON:   All right, Your Honor, may I have just

19   a minute?

20         That's all I have on cross, Your Honor.

21         THE COURT:   Redirect?

22         MS. BEVINGTON:   I don't have anything further, Your

23   Honor.

24         THE COURT:   Mr. Dent, that's -- you're going to stay

25   with us, are you not?

1          THE WITNESS:  Yes, I am   Thank you.

2          THE COURT:  Where are we now on the presentation of

3    evidence?

4          MS. BEVINGTON:  Your Honor, I have Mr. McCloy's

5    direct, which shouldn't be too long.

6          MR. DAVIDSON:  And by the way I'll take a direct

7    proffer from Mr. McCloy.

8          THE COURT:  Well, I think it would be prudent that we

9    have a complete record.  We can -- we're going to have to come

10   back, regardless, this afternoon.  Let's go ahead and take our

11   midday break and be ready to go at 20 after 1.

12         MS. BEVINGTON:  Thank you, Your Honor.

13      (Recess from 12:20 p.m until 1:25 p.m)

14         THE COURT:  Okay, have we got everybody, including

15   Mr. Dent?

16         MR. DENT:  Yes, Your Honor.

17         THE COURT:  Ms. Bevington, are you ready to proceed?

18         MS. BEVINGTON:  Yes, Your Honor.  I would call Ross

19   McCloy.

20      ROSS MCCLOY, PLAINTIFF WITNESS, AND OFFICER OF THE COURT,

21   TESTIFIED AS FOLLOWS:

22                         DIRECT EXAMINATION

23   BY MS. BEVINGTON:

24   Q.   Mr. McCloy, can you state your name for the record, please?

25   A.   Ross McCloy.

1   Q.   And what is your profession?

2   A.   I am an attorney here in Panama City.

3   Q.   How many years have you been involved in the practice of

4   law?

5   A.   Twenty-seven.

6   Q.   And during those 27 years, how many times has your ethical

7   behavior been the subject of a motion filed with any court?

8   A.   Never.

9   Q.   What is your role in the matter on which we are here today,

10   the John Doe vs. Francis case?

11   A.   I represent, with Tom Dent, a number of plaintiffs who have

12   filed a civil suit against the defendants in this case.

13   Q.   I want to turn your attention to the civil forfeiture

14   matter that is pending that's related to the Girls Gone Wild

15   organization.

16       Can you tell us, of the documents or videos that you saw in

17   the course of that civil forfeiture proceeding, which of those

18   were not provided to defense counsel in that case?

19   A.   None, to my knowledge.

20   Q.   Did you provide any of the civil forfeiture documents to

21   your co-counsel, Mr. Dent?

22   A.   You're talking about videotapes and things of that nature?

23   Q.   Correct.

24   A.   No, I did not.

25   Q.   Did Mr. Dent, to your knowledge, ever see any of the

1   documents or videotapes that had been seized by the Bay County

2   Sheriff's Office?

3   A.   I believe he saw some.  I believe he testified that he saw

4   some before we filed the civil suit of our clients only.

5   Q.   Did you assist him in making the arrangements to view those

6   tapes?

7   A.   He and I both viewed those tapes.  I think we did it on a

8   separate basis.  Whether I made a phone call to the sheriff's

9   office to line his visit up, I don't know.

10   Q.   Did Franklin Harrison have any role in setting up that

11   arrangement?

12   A.   No.  I believe my contact was directly with the sheriff's

13   investigators.

14   Q.   Can you tell us what information you used from the

15   videotapes or information to identify or solicit any clients in

16   this civil action?

17   A.   Absolutely none.

18   Q.   What is your understanding of the access that Mr. Julin has

19   had to -- and this question deals with all of the documents

20   seized in the criminal matter -- what is your understanding of

21   the access that Mr. Julin has had to those documents?

22   A.   I have been informed by the state attorney's office and the

23   sheriff's office, that his access is as full and complete as

24   mine has been.  If he wants to look at anything, all he has to

25   do is ask and set up an appointment.

1    Q.    Have you had any discussions with him about that?

2    A.    I believe I have.

3    Q.    Were you already representing the plaintiffs in this action

4    when you agreed to work on the civil forfeiture matter?

5    A.    All of that occurred at or near the same time.  I can't

6    tell you what occurred first.

7    Q.    What was your reaction to being asked to work on both of

8    these cases?

9    A.    There was a bit of concern in our office as to whether we

10    would be conflicted out in a representation of both of the

11    plaintiffs, in the civil forfeiture case and in this case.

12    Q.    What did you do about that?

13    A.    I believe I contacted Tony Boggs at the Florida Bar and had

14    a discussion with him, and read the rules that obviously have

15    been cited in this proceeding, and we came to the conclusion

16    that we had aligned interests in terms of chasing the same bad

17    guy, if you want to call him that, and as long as we disclosed

18    to our clients the inadequacy of the ability to satisfy a final

19    judgment with an airplane or car, we would be fine with that,

20    and we have done that.

21    Q.    I want to turn your attention to the motion to stay the

22    civil proceedings pending the criminal action, and particularly

23    that hearing that was held on February 4, 2004.  Were you

24    present at that hearing?

25    A.    Yes.

1   Q.   Was the motion to stay granted?

2   A.   Yes.

3   Q.   Was there any exception to the stay?

4   A.   The judge in the -- at the hearing, carved out an exception

5   for the preservation of the information relating to the

6   criminal charges, documents, videotapes, things of that nature.

7   Q.   What objections did the defendant raise to that exception?

8   A.   Absolutely none.

9   Q.   The transcript of the hearing reflects that Judge Rodgers

10   had asked whether the subpoenas would be issued right away.

11   A.   Yes, ma'am

12   Q.   Do you recall that?

13   A.   Yes.

14   Q.   It's been two years, and the protective subpoenas were

15   filed after those two years.  Why that delay?

16   A.   It's just something that slipped through the cracks.  I

17   don't have a good excuse for that.

18   Q.   And what -- how come it was issued when it was issued?

19   A.   That's when we were informed by the state attorney's office

20   of the pendency of a potential plea agreement, and it reminded

21   me, and I think I maybe then reminded Tom Dent of it, that we

22   still had not issued that preservation subpoena.

23   Q.   And so what was your intent in issuing the subpoena?

24   A.   The same as it was in February of 2004, to ensure that none

25   of the evidence disappeared at the conclusion, or potential

PDF created with pdfFactory trial version www.pdffactory.com

1   conclusion, of the criminal case or any of the cases.

2   Q.   Did you have any other intent?

3   A.   No, I did not.

4   Q.   The defendants, in their motion to show cause, have

5   suggested that Judge Rodgers' comment about -- the question,

6   are you going to issue this subpoena timely? -- that what that

7   implies is that after this delay, the carve-out from the stay

8   has somehow expired.   Do you agree with that reading of the

9   judge's ruling?

10  A.   No, I don't.   And if I can explain a minute on that if I

11  can please.   The court noted earlier that the transcript was

12  not typed up until November of last year.   I don't have any

13  notes in my file to reflect exactly what occurred at the

14  hearing itself, so obviously Mr. Dent and Mr. Julin and I,

15  before November of last year, were just going by what we

16  remembered.

17       The purpose of transcribing the hearing itself in November

18  was for me to insert portions of that into a motion for -- a

19  renewed motion for a status conference wherein I reminded the

20  court, this court, this new judge, in a footnote, that the

21  prior judge had indicated at that hearing that if we felt

22  things were moving too slowly, we could come back for another

23  status conference.   That was why it was typed up.   I did not

24  read the -- I did not reread the transcript before I prepared

25  the subpoenas.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Do you recall having an understanding of why the judge had

2    made the comment about timeliness during the hearing?

3    A.   We did not know at that time, Ms. Bevington, exactly when

4    the criminal case would conclude, and so if it was going to

5    conclude sometime in the near future, obviously we needed to

6    get a stick in the spokes to stop the disappearance of any

7    investigative materials.

8    Q.   There was also a suggestion in the defendant's motion that

9    your subpoena exceeded the scope of what was being permitted.

10   Can you comment on that?

11   A.   All I can tell you is that my recall, without going back

12   and looking at the transcript at the time I prepared the

13   subpoenas, was that we were putting a hold on all investigative

14   materials, videotapes, identity of witnesses, written

15   documents, things of that nature.

16   Q.   When you sent this protective subpoena, who did you send it

17   to?

18   A.   You mean a copy of it, or who did I serve it on?

19   Q.   The original and everything.   Tell me everybody who got it.

20   A.   I served a copy -- I think I had a conversation with Mark

21   Graham with the state attorney's office to let him know one was

22   coming to him   I think I had already prepared it.   I'm not

23   sure I had served it upon him

24        And he reminded me that there were -- there would be

25   documents of a similar nature at the state -- I'm sorry, at the

PDF created with pdfFactory trial version www.pdffactory.com

1    sheriff's office.   So I prepared another one, and I contacted

2    Mr. Larson, I believe, at the sheriff's office to tell him the

3    same thing, you're getting a subpoena, but the purpose is not

4    for you to produce documents, it's simply not to destroy

5    documents, and I want to make it open-ended, and there will be

6    a discussion about when and where there's going to be a

7    production of the documents.

8         I did send a copy of the first subpoena to the sheriff's

9    office to Mr. Julin.   I sent a copy of the first subpoena of

10   the state attorney's office to Mr. Julin, and I sent a copy of

11   the third subpoena, which was a new subpoena to the state

12   attorney's office, to Mr. Julin as well.

13   Q.   And the comment that you just testified to that you gave to

14   the person at the sheriff's office with respect to the fact

15   that you did not want production with the subpoena, did you

16   make any similar sort of comment to Mark Graham at the state

17   attorney's office?

18   A.   Yes.

19   Q.   I want to turn your attention to Local Rule 77.3, which

20   prohibits extrajudicial comments that might disadvantage one of

21   the parties in litigation.   Are you familiar with that rule?

22   A.   Yes.

23   Q.   Describe for the court, if you would, all public

24   extrajudicial releases of information regarding the criminal

25   and/or the civil matters in which you have participated related

1    to the Girls Gone Wild.

2    A.   I have made none.

3    Q.   Can you describe for the court any threats that you have

4    made to make any such public extrajudicial releases?

5    A.   I have made none.

6    Q.   Now, Mr. McCloy, have you reviewed the allegations in the

7    motion regarding the threat to conduct a national media

8    campaign?

9    A.   Yes, ma'am

10   Q.   What was your reaction to reading that?

11   A.   I was very surprised when I first read that, and then I

12   decided I needed to check up on that to ensure, if there is

13   some factual basis to it, where the facts are.

14   Q.   So what did you do to check up on the factual basis?

15   A.   I contacted Larry Bassford at the state attorney's office

16   to ask him if Tom Dent or I had made any such threats, and he

17   told me that we had not.  I had a meeting with Steve attorney

18   -- I'm sorry, Steve Meadows and Bill Lewis of the state

19   attorney's office, and was told the same thing, that neither

20   Tom Dent nor I had made such a representation.  And I had a

21   meeting with Mark Graham and Bill Lewis along the same lines,

22   and again was told that neither Tom Dent nor I had made any

23   threats of a national media campaign.

24            MS. BEVINGTON:   Your Honor, that's all I have.

25            THE COURT:   Mr. Davidson?

1        MR. DAVIDSON:   I just have one thing, Judge,

2   Mr. McCloy.

3                   CROSS-EXAMINATION

4   BY MR. DAVIDSON:

5   Q.   There is no question that Judge Rodgers entered an order

6   granting the stay on February 5th, 2004, correct?

7   A.   She entered an oral order and a written order that day.

8   Q.   Right.   There is a written order in the docket granting the

9   motion to stay?

10  A.   There is a written order in the docket.

11        MR. DAVIDSON:   Thank you.

12        THE COURT:   Redirect?

13        MS. BEVINGTON:   No redirect, Your Honor.

14        THE COURT:   Anything further?

15        MS. BEVINGTON:   Yes, Your Honor, I'm through, with one

16  exception.   I would move into evidence the three affidavits

17  that have been filed in this case from Mr. Julin, as well as

18  from Mr. McCloy and from Mr. Dent, just to round out the

19  evidence.   I think --

20        THE COURT:   They're already part of the court file,

21  but they'll be admitted as evidence for this purpose.

22     (Plaintiff Exhibit Nos. 1, 2 and 3 received in evidence.)

23        MS. BEVINGTON:   Thank you, Your Honor.

24        THE COURT:   Mr. Davidson.

25        MR. DAVIDSON:   Your Honor, very brief rebuttal.   Just

1   two issues, one of which I've already raised with

2   Ms. Bevington.

3          In view of the debate, if you will, regarding Mr. Dent

4   versus Mr. Julin, I would like to offer as past recollection

5   and recorded as Exhibit, I think 1, would be Mr. Julin's

6   contemporaneous notes of the first telephone conversation with

7   Mr. Dent; and as Exhibit 2, the minutes of the -- excuse me,

8   the notes of the second telephone conversation with Mr. Dent.

9          THE COURT:  All right, they'll be admitted.

10         MS. BEVINGTON:  No objection.

11     (Defendant Exhibit Nos. 1 and 2 received in evidence.)

12         MR. DAVIDSON:  Judge, the only other thing,

13  Ms. Bevington was quick enough -- I was not -- I would ask Your

14  Honor to determine and order that the privilege invasion which

15  primarily involved Mr. Simpson -- and Your Honor may recall

16  that I objected at the outset, but it was obvious it needed to

17  be explored -- be deemed to be partial only for the issues

18  about what we're here today for.

19         THE COURT:  Okay.  That was our understanding, and

20  this will confirm that that was permitted only for that very

21  limited purpose.

22         MR. DAVIDSON:  Thank you, Your Honor.  That's all we

23  have.

24         THE COURT:  Krissy, let me see the two exhibits,

25  please.

1          Mr. Julin, let me ask you two short questions.   You

2     have identified Simpson and the other criminal defense lawyer

3     as the source of some of the information that led you to some

4     of your conclusions.  Is that correct?

5          MR. JULIN:  That is correct, Your Honor.

6          THE COURT:  Before filing your present motion to show

7     cause, did you ask them to review a draft of that motion?

8          MR. JULIN:  Yes, I did, Your Honor.

9          THE COURT:  So what you filed would have any comments

10     by them?

11          MR. JULIN:  It does indeed, Your Honor.

12          THE COURT:  All right, thank you.   You can sit down.

13          All right, counsel, the motion for order to show cause

14     and to disqualify the plaintiffs' counsel is denied.

15          I am very concerned about the motion.   I am concerned

16     that some of the accusations in that motion are not supported

17     by the facts that could be determined by reasonable inquiry

18     under the circumstances as contemplated by Rule 11.   I'm not

19     certain that some of the conclusions raised by Mr. -- reached

20     by Mr. Julin have plausible evidentiary support.

21          Mr. Davidson, does your law firm have a panel or some

22     other body to provide ethical advice to the members of the

23     firm?

24          MR. DAVIDSON:  Your Honor, I am the ethics partner for

25     the Miami office, and I'm on the firm ethics committee.

PDF created with pdfFactory trial version www.pdffactory.com

1      THE COURT:   I direct that you will immediately provide

2   to the ethics panel the transcript of this proceeding, the

3   motions and the responses, all of the material connected with

4   this motion, because I think there needs to be a silver look

5   taken.

6          There were very serious accusations made against

7   members of the Bar that cut quite to the quick of lawyers'

8   reputation.   I don't know how we can unring the bell of the

9   ensuing publicity.   It was certainly a matter of public record.

10  I am concerned about that.

11         I am particularly concerned about the six pages that

12  were devoted, I believe gratuitously and for improper purpose,

13  about the credibility of the plaintiffs.   Mr. Julin suggests

14  that that had relevance to the reasonableness of the proposed

15  plea bargain, except he has omitted the terms of that plea

16  bargain.   That would be -- even if it were relevant -- I think

17  whether it were reasonable, quite frankly, and I'm not sure

18  that the reasonableness of the plea bargain has any relevance

19  whatsoever to the issues that were properly raised in this

20  particular motion.

21         You all chose not to call Simpson and his colleague,

22  and that is a decision you had to make.   I would have felt

23  better had they been here and I would have felt better had the

24  state attorney's representatives been here, but I can

25  anticipate their possible objections with the ongoing

PDF created with pdfFactory trial version www.pdffactory.com

1   prosecution.

2       One thing that concerns me in this case, it seems like

3   a lot of this could have been avoided with more professionalism

4   and communication.  And henceforth in this case, should there

5   be any question about the need for prior communication,

6   particularly as required by Local Rule 7.1, the lawyers are

7   directed they are to err on the side of compliance, because it

8   seems to me that just a few telephone calls, if everybody was

9   truly concerned about the actions of the other lawyers on

10  either side, that could have been resolved by a simple

11  telephone call.  Maybe not.

12      The criminal prosecution has been going on over three

13  years.  Are any of the plaintiffs now minors?

14      MR. McCLOY:  No, Your Honor, I do not believe they

15  are.

16      THE COURT:  All right, I am ordering that the stay is

17  lifted, with one exception, and that there will be no testimony

18  -- discovery of a testimonial nature directed to the individual

19  defendants.  Is that clear?

20      MR. McCLOY:  Yes, Your Honor.

21      THE COURT:  There will be a new scheduling -- I know

22  you've had a so-called initial scheduling order sometime in the

23  past -- there will be a new scheduling order, and that will be

24  followed by a new Rule 26 meeting of counsel, with the

25  appropriate filings and disclosures.  And we'll get this case

1    on the road.

2          I am very concerned about the accusations that were

3    made, because from what I heard here today, the plausible

4    interpretation of the evidence does not support what you wrote,

5    Mr. Julin.

6          I can possibly understand it had it been a new, novice

7    attorney practicing by himself, but you are an experienced

8    veteran in one of the best law firms in the world with all the

9    resources available.

10          I think this is going to be a fair fight, and that

11    means whoever prevails is going to be on what the law and the

12    evidence is, and there doesn't need to be anymore collateral

13    fights amongst the attorneys.

14          There will be a more detailed written order on this

15    decision.  This effort has required considerable time and

16    expense by both sides.  And as provided by Rule 11, I am, on

17    the Court's initiative, going to order that the -- Mr. Julin

18    and his firm show cause by filing before May 12th why it has

19    not violated the provisions of subparagraph B in terms of the

20    motion being presented for an improper purpose, and most

21    glaringly is the inclusion of the testimony about the

22    credibility, and argument about the credibility of the

23    plaintiffs, which I think had nothing to do with the issues

24    properly raised by the motion.

25          I am concerned about the citation of at least one

PDF created with pdfFactory trial version www.pdffactory.com

1    case, perhaps two, in Mr. Julin's memo, that it is not -- the

2    holding of that case was not candidly stated.   And I am

3    concerned about the factual contentions of which -- I am

4    concerned that reasonable inquiry under the circumstances would

5    have led Mr. Julin to a different conclusion.

6            The plaintiffs will file a response to show the

7    plaintiffs' showing of cause by the following Friday, which is

8    the 19th.   The sanctions I contemplate are an award of

9    attorneys' fees and costs that were occasioned by Mr. Julin's

10   motion.

11           Are there any questions?

12           MR. McCLOY:   None from the plaintiff, Your Honor.

13           MR. DAVIDSON:   No, sir.

14           THE COURT:   We're adjourned.

15       (Proceedings concluded at 1:47 p.m)

16                       *********

17           I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19

20

21   _____          _____

     LISA GIROD JONES, RPR, RMR, CRR           Date
22   Official Court Reporter

23

24

25

1

<strong>INDEX</strong>

PAGE

2

**OPENING STATEMENTS**
3      By Mr. Julin      4
     By Ms. Bevington      21

4

**WITNESSES FOR THE DEFENSE**
5

**THOMAS R. JULIN**
6      Direct Examination By Mr. Davidson:      37
     Cross-Examination By Ms. Bevington:      43
7      Redirect Examination By Mr. Davidson:      83

8 **WITNESSES FOR THE PLAINTIFFS**

9 **FRANKLIN HARRISON**
     Direct Examination By Ms. Bevington:      87
10      Cross-Examination By Mr. Davidson:      96

11 **THOMAS DENT**
     Direct Examination By Ms. Bevington:      97
12      Cross-Examination Mr. Davidson      116
     Cross-Examination By Mr. Davidson:      116
13

14 **ROSS MCCLOY**
     Direct Examination By Ms. Bevington:      123
     Cross-Examination By Mr. Davidson:      131
15

16 **CERTIFICATE OF REPORTER**      138

17

18 <strong>PLAINTIFF EXHIBITS</strong>
**NO.:**      **RECEIVED**
19 1     Affidavit of Thomas R. Julin      132
2     Affidavit of D. Ross McCloy, Jr.      132
20
3     Affidavit of Thomas G. Dent      132
21

22 <strong>DEFENSE EXHIBITS</strong>
**NO.:**      **RECEIVED**
23 1     Notes of telephone conversation No. 1      133

24 2     Notes of telephone conversation No. 2      133

25

PDF created with pdfFactory trial version www.pdffactory.com